**IN THE UNITED STATES DISTRICT COURT**
**FOR DISTRICT OF KANSAS**

| | |
|---|---|
| **Justin Spiehs** | |
| Plaintiff | |
| v. | |
| **Lisa Larsen,** in her individual capacity as Lawrence City Commissioner and Mayor of the City of Lawrence, Kansas<br>* | Case No. 5:23-cv-4107 |
| **Courtney Shipley,** in her individual capacity as Lawrence City Commissioner and Mayor of the City of Lawrence, Kansas<br>* | |
| **The Lawrence City Commission, as the governing and legislative body of the City of Lawrence, Kansas**<br>* | |
| **Board of Directors of the Free Public Library of the City of Lawrence, Kansas**<br>* | |
| **Kathleen Morgan**, in her individual capacity as Director of Development & Community Partnerships for the Lawrence Public Library<br>* | |
| **Marc Veloz**, in his individual capacity as Community Resource Specialist for the Lawrence Public Library<br>* | |
| **Sara Mathews**, in her individual capacity as Outreach Coordinator for the Lawrence Public Library<br>* | |
| **Erica Segraves**, in her individual capacity as Human Resources Manager for the Lawrence Public Library<br>* | |
| **Phillip Howard**, in his individual capacity as Maintenance & Custodial | |

Supervisor for the Lawrence Public Library

*

**Unidentified Library Security Guard**, in his individual capacity

Defendants

## COMPLAINT

COMES NOW the plaintiff Justin Spiehs, by and through counsel, and for his Complaint against each defendant, hereby states as follows:

## JURISDICTION AND VENUE

1. This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C.§ 1983.

2. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1346, as this action challenges the defendants' violation of the plaintiff's civil rights pursuant to 42 U.S.C. § 1983.

3. Venue lies in this Court pursuant to 28 U.S.C. § 1391, as a substantial part of the event and omissions giving rise to the claims occurred in this judicial district.

## THE PARTIES

4. Plaintiff Justin Spiehs is a natural person, citizen of Kansas, and legal resident of Douglas County, Kansas. Mr. Spiehs has a doctorate degree in Lifespan Human Development and a Masters in Marriage and Family Therapy.

5. Defendant Lisa Larsen is a natural person who was elected or appointed mayor of the City of Lawrence, Kansas. Larsen is a member of the Lawrence City Commission (the Commission) which constitutes the governing body of the City of Lawrence. As

a member of the Commission, the mayor defendant Larsen, in her official capacity, exercises final policymaking authority for policies that govern Commission, including the policies governing speakers at public meetings. She is sued in her individual capacity.

6. Defendant Courtney Shipley is a natural person who was elected or appointed mayor of the City of Lawrence, Kansas. Shipley is a member of the Lawrence City Commission. As a member of the Commission, the mayor defendant Shipley, in her official capacity, exercises final policymaking authority for policies that govern Commission, including the policies governing speakers at public meetings. She is sued in her individual capacity.

7. The Lawrence City Commission is the governing and legislative body of the City of Lawrence, Kansas. The Lawrence City Commission provides for a public forum presided over by a Mayor of the City of Lawrence.

8. The Public Library of the City of Lawrence is a municipal public body and a quasi-political subdivision of the City of Lawrence, Kansas.

9. Board of Directors of the Free Public Library of the City of Lawrence, Kansas, is a governing body appointed by the Lawrence City Commission and is funded by the City of Lawrence under Charter Ordinance No. 16. The Lawrence Public Library exists pursuant to the provisions of K.S.A. 12-1222, with powers and duties as provided in K.S.A. 12-1215 and K.S.A. 12-1225 and under the Lawrence Charter Ordinance #16.

10. Kathleen Morgan is an employee of the City of Lawrence and is sued in her individual capacity as Director of Development & Community Partnerships for the Lawrence Public Library.

11. Marc Veloz is an employee of the City of Lawrence and is sued in his individual capacity as Community Resource Specialist for the Lawrence Public Library.

12. Sara Mathews is an employee of the City of Lawrence and is sued in her individual capacity as Outreach Coordinator for the Lawrence Public Library.

13. Erica Segraves is an employee of the City of Lawrence and is sued in in her individual capacity as Human Resources Manager for the Lawrence Public Library.

14. Phillip Howard is an employee of the City of Lawrence and is sued in his individual capacity as Maintenance & Custodial Supervisor for the Lawrence Public Library.

15. The Public Library of the City of Lawrence, the Board of Directors of the Free Public Library of the City of Lawrence, Kathleen Morgan, Marc Veloz, Sara Mathews, Erica Segraves, Phillip Howard, and unidentified security guard, are collectively referred to as "the Library Defendants."

## STATEMENT OF FACTS

### *History of Topics Addressed at Commission Activities*

16. At least since 2021, the Commission has engaged in activities concerning voicing its opinions and public influence over matters the Commission has no control over such as those made in its proclamations.

17. For example, the Commission has historically engaged in activities since 2022 taking positions about topics such as "World Polio Day," "Indigenous Peoples Day," "Domestic Violence Awareness Month," "Maryemma Graham Jubilee Day, "Day of Awareness for Missing and Murdered Indigenous Women, Girls, and Persons," "Child Abuse Prevention Month," "Imagine a Day Without Water," and "National Health Center Week."

18. In May 2023, the Commission proclaimed the "month of June is designated as LGBTQ+ Pride Month and it commemorates the Stonewall Rebellion that occurred during the weekend of June 27-29, 1969 in New York City, New York, that gave birth to the modern lesbian, gay, bisexual, and transgender (LGBT) civil rights movement."

19. Plaintiff Justin Spiehs has historically been the most infamous and outspoken of all of the many public speakers appearing at the Commissions' open meeting public speaking sections.  At all relevant times, Mr. Spiehs' speech was protected speech and concerned matters of public concern and was truthful.

20. Mr. Spiehs' speech to the individual Commissioners at these meetings has been, and is viewed by the defendants, as mocking, vulgar, vitriolic, repugnant, hateful, personal, and offensive to those Commissioners.  Mr. Spiehs' speech emboldened other public speakers to also engage in the same kind of protected speech to the Commission expressing viewpoints the Commission did not appreciate or like.

21. Based upon the words and actions of the defendants, the defendants viewed Mr. Spiehs as a leader, troublemaker, and instigator of all kinds of mocking, vulgar, vitriolic, repugnant, hateful, personal, and offensive speech directed to each of the

Commissioners by other public speakers at these open meetings.  Because of this and other reasons, the defendants targeted Mr. Spiehs for disparate treatment in retaliation to punish him and make him an example to those other speakers and the rest of the Lawrence viewing public.

### Commission's Public Forum Written Policy as of October 11, 2022

22. The Commission looked for a way to give the Mayor unlimited and unguided discretion to apply or interpret the speaking rules arbitrarily.  The Commission decided to utilize a vague phrase "germane to the business" as the standard as to what viewpoints could be expressed.  They also decided not to define the phrase so as to provide no meaningful guardrails as to its interpretation by a presiding Mayor. The defendants all understood that by enacting this "should be germane to the business" standard that the defendant Mayor could wield unreasonable and unrestrained power to define at any given meeting, and on the spot, what was "germane" and not "germane" to the activities of the Commission.

23. But the policy does not require topics under the General Comment section to actually be "germane" because the Commission made that a suggestion when it used the word "should" rather than "shall" in the Policy.  Despite the distinction, the defendant Mayors interpret the General Comment "germane" condition as mandatory contrary to the language in the Policy.

24. Defendant Larsen admitted this in an interview with the Lawrence Journal World in November 2023.  In the article it commented that Justin Spiehs, was "a former

Douglas County Commission candidate who was removed from past City Commission meetings." The Article goes on to state:

> Larsen told the Journal-World that the issue of what is considered a germane topic is very subjective, and the city doesn't have a policy that provides clear guidelines on the topic. Instead, she said each commission is given wide latitude to make that determination, which she said can be difficult.

25. This statement was made after numerous public speakers had spoken in favor of Palestinians regarding the Israeli-Hamas conflict which Larsen declared was not germane – but then repeatedly allowed all of those speakers to continue and did not have them ejected by police from the building. None of those speakers got the Justin Spiehs' treatment.

26. The Lawrence City Commission, the Governing Body, adopted City of Lawrence, Kan., Res. No. 7451 (October 4, 2022), establishing its public speaking rules and procedures. In that Resolution it states in part the following:

> (d) General Public Comment. When the presiding officer asks for General Public Comment, persons are encouraged to speak on items not scheduled for discussion on any agenda prepared for that meeting. As a general practice, the Governing Body will not discuss or debate items nor will the Governing Body make decisions on items presented during General Public Comment. General Public Comment should be limited to issues and items germane to the business of the Governing Body.
>
> (e) Public Comment on a Specific Item. When the presiding officer asks for Public Comment on a specific item being considered by the Governing Body, persons may comment on that specific item at that time. Persons will be limited to addressing the Governing Body on that specific item one time, unless otherwise permitted by the presiding officer. Public Comment on a specific item shall be germane to the item being discussed.
>
> (f) Decorum. Members of the public are encouraged to act with decorum and to address the Governing Body and each other with respect. The following will not be tolerated: fighting words, slander, speech invasive of the privacy of individuals, unreasonably loud or repetitious speech, and speech so disruptive of the

> proceedings that it substantially interferes with the Governing Body's ability to conduct the business of the City. Any member of the public engaging in disruptive behavior that substantially interferes with the Governing Body's ability to conduct the business of the City may, after a warning, be subject to removal from the meeting. During a meeting, it shall be the duty of the presiding officer to preserve order and decorum.

27. Since October 11, 2022, Public speakers, such as Chris Flowers, Nicole, Amy, and many others "Speakers" identified in this Complaint are routinely allowed by the defendant mayors to speak during the General Public Comment portions at the Commission meetings on topics, subjects, and matters of which the Commission has absolutely no control over. Despite speaking on those topics over which the Commission has no control over, the defendant mayors have not each time interrupted, terminated, or instructed police to have a speaker not named Justin Spiehs removed because of an off-topic discussion.

28. The Commission also allows written comments, as a part of the General Public Comment portion of the meeting, to include matters the Commission has no control over. For example, On November 6, 2023, Lora Jost wrote, in part, that they "support a city resolution calling for a ceasefire in Gaza" and that "Israel has bombed Gaza relentlessly and indiscriminately." Other verbal and written comments of speakers contain vulgarity or other topics of which the Commission has no control over.

29. Speaker Chris Flowers was allowed by the defendant mayors to communicate in his written comments to the General Public Comment on April 6, 2020, when speaking about the Hobby Lobby's owner's wife, that when she said God told her to "guide, guard, and groom" that "I think she misheard the message. I think God told her, "Quit bringing up my name to justify your selfish greed. Fuck you, you money

grubbing cunt!" That's what I think God told her…." Speaker Chris Flowers was never punished or removed from the General Public Comment portion of the Commission meetings because of that statement.

30. Plaintiff Mr. Spiehs has been a frequent and consistent speaker on a wide range of topics including criticizing the defendant Commission and Mayors' policies, ethics, and competency. Because of Mr. Spiehs' viewpoints contained in his prior constitutionally protected activity, the defendants targeted Mr. Spiehs with adverse consequences that would chill a person from engaging in appearing before the Commission to speak.

31. The Commission has no control over Douglas County elections yet the defendant Mayor Shipley arbitrarily allowed Mr. Spiehs to speak on his campaign for county commissioner at the October 4, 2022, general public comments section. Mr. Spiehs spoke extensively about a county commissioner named "Patrick" regarding raising taxes and a mill leavy. Mr. Spiehs encouraged viewers to check out his YouTube regarding his positions regarding his election campaign for county commissioner.

32. Another speaker, Nicole, spoke on the dangers of following liberal politicians and criticized President Biden regarding the boarder and missing and abused children. She compared the Biden policy to the Trump policy. Nicole stated "under Trump policy" the border policy was much better than compared to Joe Biden's. Mayor Shipley did not interrupt, terminate, or require either Mr. Spiehs or Nicole to stop speaking or to leave the building because of purportedly speaking off-topic.

33. At the October 11, 2022, Commission meeting, speaker Chris Flowers stated that he had discovered a loophole to the "should be germane to the business" requirement by simply asking that the speech be made a proclamation. Flowers reasoned that proclamations have no subject limitations and that incorporating the speech into a proclamation request would make the speech germane.

34. The next speaker following Mr. Flowers was Mr. Spiehs:

Dr. Justin Spiehs: My name is Dr. Justin Spiehs. I'm running for Douglas County commissioner in district 1 as a Republican candidate. I want to go over some numbers with you guys here. This, these are the numbers on the last day that Trump was in office and how things are today. So on the last day that Trump was in office the inflation rate was at 1.4%, today it's at 8.3%, that's a little low. Gas was a national average of $2.39 when Trump was in office, today it's $3.76. The 30 year mortgage rates were at 2.65% today they are at [interrupted and talked over by Mayor Courtney Shipley] 7.08%

Shipley: [interrupting and talking over Spiehs] Dr. Spiehs, is there some way that we have control, is there some way that this city commission has control over inflation?

Spiehs: [while being talked over by Shipley] I'd like to make this a proclamation of how stupid Democrats are. Thank you. The average rent prices were $1,625, today they are at $2,039. The NASDAQ was up 13,322 points [interrupted and talked over by Shipley] …

Shipley: [interrupting and talking over Spiehs] Mr. Spiehs, is there some way this city commission has control over the NASDAQ?

Spiehs: [while being interrupted and talked over by Shipley] Yeah, I just said I'd like to make this a proclamation, please, Nazi. Thank you.

Shipley: Is there any…

Spiehs: I, I'm making it clear to you [interrupted and talked over by Shipley]

Shipley: [interrupting and talking over Spiehs] Are you ready to be removed?

Spiehs: I'm making it clear to you that I would like, can you stop my time?

Shipley: No

Spiehs: Why not? [Interrupted by Shipley]

Shipley: [Interrupting and talking over Spiehs] Because so far you haven't said anything that has anything to do with this body.

Spiehs: [while being talked over by Shipley] I answered your question: I'd like to make this a proclamation that the city consider how asinine the Democrats are so thank you [interrupted by Shipley]

Shipley: [Interrupting and talking over Shipley] This is a non…

Spiehs: And so the NASDAQ is down 10,829 points [interrupted by Shipley] …

Shipley: [interrupting and talking over Spiehs] Again, we have no control over the NASDAQ, Mr. Spiehs.

Spiehs: [while being talked over by Shipley] Grocery prices were at [inaudible due to being talked over by Shipley] 7%, today it's at 13.5%. The electricity rose 1.5% today it's at 15.8%. The real average hourly earnings increased 4% last day Trump was in office, today it's [interrupted by MS] [inaudible due to being talked over by Shipley]

Shipley: [interrupting and talking over Spiehs] It's kind of you to come today, sir, but if you don't have anything in the last 2 minutes…

Spiehs: [continuing while being talked over by Shipley] Now that I'm getting around to the business of the city, the reason why I bring this up is because I stand on the corner and I campaign and one of my signs says that Democrat [Douglas County Commissioner] Patrick Kelly raised your property taxes [interrupted and talked over by Shipley]

Shipley: [Interrupting and talking over Spiehs] This is a non-partisan body, whether anyone is Democrat or Republican is not relevant.

Spiehs: …[continuing while being interrupted by Shipley] And that I never will [raise property taxes as county commissioner] and we have people that...Can you stop, Nazi?

Shipley: [interrupting and talking over Spiehs] No, sir.

Spiehs: [while being talked over by Shipley] I'm trying to, I'm trying to make my general public comment.

Shipley: [interrupting and talking over Spiehs] Our time is the city's time.

Spiehs: And so, yeah [while being talked over by Shipley] I'd like to make it a proclamation. I'd like to make it a proclamation.

Shipley: [speaking over Spiehs] You must speak on items germane to this body.

Spiehs: I just did, Courtney.

Shipley: [interrupting and talking over Spiehs] No, you have not.

Spiehs: [While being talked over by Shipley] Didn't you just hear what he said [referencing previous public speaker, Chris Flowers], I'd like to make this a proclamation. What is going on here? [interrupted by Shipley]

Shipley: [Interrupting and talking over Spiehs] Rent and gas have nothing to do with the city of Lawrence.

Spiehs: [While being talked over by Shipley] You guys [the city commission] can do whatever you want with a gas pipeline that doesn't go through here, and then when I'm bringing up something [interrupted and talked over by Shipley] that effects people's taxes …

Shipley: [Interrupting and talking over Spiehs] I welcome you to leave this room, sir.

Spiehs: What's that?

Shipley: You've been warned.

Spiehs: Alright, let's do it, then.

Shipley: Okay.

Spiehs: Let's do it. Why are you shutting me down? I want to make this a proclamation [interrupted and talked over by Shipley] on how asinine you guys are.

Shipley: [interrupting and talking over Shipley] Because you have yet to speak about a single thing to do with the body.

Spiehs: [while being talked over by Shipley] Let's go, let's make this a proclamation. Let's go. So anyway what I was saying is [interrupted by Shipley]

Shipley: [Interrupting and talking over Spiehs] Thank you for leaving, sir.

Spiehs: [continuing] …people drive by me and they shake their heads at me [interrupted by Shipley]

Shipley: [Interrupting and talking over Spiehs] Excuse me, sir, you're finished.

Spiehs: And the reason why I'm bringing all this up is because Patrick Kelly [interrupted by Shipley banging her gavel] had $55 million that he could have dipped [interrupted by Shipley] into to decrease your property taxes…

Shipley: [Interrupting and talking over Spiehs] This body is paused…

Spiehs: [continuing from being interrupted by Shipley] and instead he increased them.

Shipley: …until you leave, sir.

Spiehs: For what?

Shipley: We have rules. I've made them clear to you.

Spiehs: What are the rules? What are the rules, Nazi? What are the rules, Nazi?

Shipley: There's nothing germane that you've said so far.

Spiehs: What are the…I want it to be a proclamation [interrupted and talked over by Shipley] and it's germane to you guys.

Shipley: [interrupting and talking over Spiehs] Thank you for coming. You're welcome to leave.

Spiehs: Nope. It's germane to, he [turning, pointing and referring to Chris Flowers] just laid out a procla… that I could make this a proclamation. Why aren't you doing that? [interrupted by Shipley]

Shipley: [Interrupting and talking over Spiehs] You are welcome to leave.

Spiehs: [while being talked over by Shipley] Why is that not important? Why is my idea not important? If I was in here about a [interrupted and talked over by Shipley] gas pipe, a gas pipeline…

Shipley: [Interrupting and talking over Spiehs] Because it has nothing to do with the business of this body.

Spiehs: [continuing from being interrupted] that doesn't go through here then it would be okay? Is that what you're saying?

Shipley: You're welcome to leave, sir.

Spiehs: I don't want to leave. I want to finish speaking. You're clearly, you are the same person [interrupted by Shipley]…

Shipley: [Interrupting and talking over Spiehs] You have yet, you have yet to say a single thing to do with the business of this body.

Spiehs: [continuing while being talked over by Spiehs] …that sat up there and said you don't want white people up on [city] boards. You're doing this because I'm a white guy. You're doing this because I'm a white guy.

> Shipley: [interrupted Spiehs] Good bye, sir.
> Spiehs: Clearly you are doing this because [interrupted by Shipley] I'm white.
> Shipley: [interrupting] Good bye, sir.
> Spiehs: You are racist [interrupted by Shipley]
> Shipley: [Interrupting and talking over Spiehs] Good bye, sir.
> Spiehs: You are a Nazi. You are exactly what you [Shipley motions to Lawrence Law Enforcement Officer (LEO) with her hand to have Spiehs removed from meeting] say we are. You are exactly what you say we are. You are a Nazi.
> Shipley: [Interrupting Spiehs] Thank you for coming.
> Spiehs: Each one of you [city commissioners] are Nazi's. And you [talking to commissioner Amber Sellers], you are [interrupted by Shipley] a Miss I'm Oppression, Miss Suppression you going to allow this to happen? She's suppressing me coming up here [inaudible due to interruption from Shipley]
> Shipley: [interrupting and talking over Spiehs] Thank you for coming. [LEO walks up to Shipley and Shipley says to LEO] I did. We have recessed this body, sir.
> Spiehs: Fuck you. You're a Nazi.
> Spiehs required to leave meeting and city hall building by LEO.

35. The word "inflation" has been brought up by speakers some 297 times since 2020 by the Commission, advisory board, and public speakers yet Shipley claimed Spiehs discussing "inflation" was off-topic because the Commission had no control over it.

36. The topics of "rent" "taxes" and "gas" has been brought up by speakers some 400 times since 2020 by the Commission, advisory board, and public speakers yet Shipley claimed Spiehs discussing those topics was off-topic because the Commission had no control over it.

37. And there was no reason why purportedly speaking off-topics merits removal from the building rather than a simple termination of the speech allowing the speaker to remain in the meeting.

38. The plaintiff Spiehs did not exceed his allotted time for his comments and in fact was not allowed to finish any of his comments.  As can be verified from the video record of the meeting, at no time did Mr. Spiehs' remarks include any fighting words, slander, speech invasive of the privacy of individuals, and it was not unreasonably

loud or repetitious speech. His speech did not substantially interfere with the Commission's ability to conduct the business of the City. The only reason provided as a warning by defendant Shipley to justify her actions was the "germane to the business" provision.

39. Yet, in the very next public meeting by the Commission on October 18, 2022, Nicole spoke again on many topics, as Mr. Spiehs did (and attempted to do) regarding former presidents without interruption or removal from the meeting by defendant Shipley. Nicole directly accused the Commissioners of censuring "viewpoints that oppose the Democrat narrative:"

> I am addressing all city commissioners so this will be germane. Former president Obama recently stated that woke democrats are destroying their party by being buzz kills. Citizens aren't attracted to the angry buzz killing woke mob. It baffles me how you don't see how you are buzz kills. Other than the fact that your'e trying as hard as you can to censure any viewpoints that oppose the Democrat narrative it seems that part of your goal is also to make sure conservative Lawrence citizens are painted in an ugly light and made to feel like their values and beliefs are crazy. Local news outlets like LJ World and the Lawrence Times work in tandem with you elected officials to push that narrative – that we are crazy and the so-called journalists choose not to cover the events the way they actually played out or they refuse to cover a conservative political candidate's actual words instead publishing their own propaganda. It may help you to understand that a few years ago that most, if not all of us, were 9-5 people that loved nothing more than spending time with our families and friends. But then, after we saw the atrocities of the medical mandates, censorship, and the destruction of freedom. Jesus calls some of us to stand up so we did and we continue to do what we feel Jesus calls us to do day by day. It used to be part of the Democrat value system to honor and respect each American's religious convictions. I would ask that you look in your hearts and allow us to speak words our God is calling us to speak. Allowing us three minutes to do our best to follow God's will is a small ask and a religious freedom that should not be taken away from any American.

40. Nicole was not interrupted once by defendant Shipley when Nicole gave that speech.

41. At the October 18, 2022, meeting Mr. Spiehs returned and stated the following:

My name is Dr. Justin Spiehs. I'm running for Douglas County commissioner in district 1 as a Republican candidate. Mayor Shipley, I'm glad to see you here tonight. I was a little worried you weren't going to be here I didn't see your gigantic GMC Yukon SUV out in the parking lot. That thing gets what? 16 miles per gallon? You know a couple weeks ago you sat up there and you proclaimed October 2nd to be Lawrence drive electric day. And that proclamation reads "Petroleum-fueled vehicles are responsible for over 50% of our local greenhouse gas emissions and are a contributing factor to airborne pollution and climate disruption threatening the health of our citizens and the sustainability of our planet." You don't really believe that, do you? You drive a car that is the size of a battleship. 16 miles per gallon. So I got a question for you guys here about the mill levy and I think that's germane to your guys' business, right? So on Sunday LJ World ran an article about the county commissioner candidates and some responses that they have. One of the questions that they asked was "In the wake of the 2023 budget being passed, there has been a lot of conversation about whether there could have been any further tax relief for folks in Douglas county especially given the county's fund balance savings which weren't used to lower the mill levy this time around." In the article a Democrat commissioner Patrick Kelly said that he noted the county's budget for 2023 actually includes a mill levy decrease of a little more than 1 mill, the equivalent of about $1,783,000 in tax dollars. So I got a couple of questions there. So LJ World is acknowledging that the mill levy didn't actually, didn't actually decrease but Patrick Kelly is saying that it did decrease so if it did in fact decrease, which it didn't, why did property taxes go up across the board for everyone? The answer is because they proposed 3 and they, or they proposed 4 and approved 3 so they only reduced 1 off their proposal, it didn't actually lower it. So my question is LJ World, is that misinformation? Hey [LJ World city commission reporter] Rochelle Valverde, is that [interrupted and talked over by Shipley] misinformation over there?

Shipley: [Interrupting and talking over Spiehs] Excuse me, could you address your comments to the commission?

Spiehs: Yeah, so how does that work? So if the mill levy actually went down by 1 why do property taxes go up? And if the mill levy, according to Patrick Kelly actually went down why is LJ World reporting that it didn't actually go down at all? Can you guys [the Lawrence city commission] explain the mill levy to us, please? [Commissioner] Bart Littlejohn, can you explain it? So I get a lot of smirks like Bart Littlejohn has there from the community when I'm out campaigning and you can smirk all you want but if you vote Patrick Kelly in you're going to, in the next year, next 2 years, next 3 years you're going to be sitting around wondering how you're going to be able to afford to pay your rent, how to pay your mortgage as your property taxes keep going up each year. I've got proposals, serious solutions on how to decrease that and actually refund your money. [3 minutes expired]

Shipley: Thank you.

15

42. Plaintiff Spiehs spoke on rent, his election campaign, taxes, defendant Shipley's SUV, the County's Mill Levy – topics the Commission has no control over – yet defendant Shipley arbitrarily decided not interrupt or have Mr. Spiehs removed over this speech on that occasion.

43. On July 18, 2023, Mr. Spiehs spoke at the General Comments part of the Commission open meeting. This meeting was transcribed by website Rev.com and is published by the Commission at https://tinyurl.com/mvbd6p77 Mr. Spiehs is identified as "Speaker 11" and the video is marked at the 01:07:26 point. "Speaker 1" is defendant mayor Larsen. The speaker prior to Mr. Spiehs did not identify as "sir." The website transcribed the dialogue as follows:

---

Speaker 1 [Larsen] (01:07:19):
Thank you sir. Ma'am, I'm sorry.
Speaker 11 [Spiehs] (01:07:26):
I think you misgendered that they there, Mayor.
Larsen: I do apologize.
Spiehs: Isn't that a hate crime? You know, under the discriminatory act you guys [the city commission] are going to be proposing that would be a hate crime, wouldn't it? Aren't you going to try to get to a point where we're not allowed to do that kind of stuff but you're up there doing it and it's just "sorry"? You guys [the local newspapers covering the meeting that night] going to run a headline about that? "Mayor misgenders they at meeting." Surely would do it to me. Talk about, talk about baseless conspiracy theories – men having babies, men having periods. Come on, [interrupted and talked over by commissioner Amber Seller] there ain't a bigger conspiracy theory than that.
Commissioner Amber Sellers [Sellers] [Interrupting and talking over Spiehs] Point of order.
Spiehs: So [interrupted again by Sellers] save your conspiracy theory [interrupted and talked over by Sellers] bullshit for somebody that gives a shit.
Sellers: [interrupting and talking over Spiehs] Point of order.
Spiehs: My name is Dr. Justin Spiehs. My doctorate is in human development from Kansas State. Back in July of 2021 I started a protest against the child mask mandates that were in effect in USD497 for the second time [interrupted and talked over by Sellers].

---

16

Sellers: [Interrupting and talking over Spiehs] Point of order.

Spiehs: because I got tired of the bullshit.

Larsen: [Interrupts by banging gavel and speaking over Spiehs]: Sir, what's it do with the city? What does your discussion [interrupted by another citizen, Michael Eravi]

Larsen: [addressing Eravi]: Sir, sir [banging gavel and pointing to Eravi] you're out of order. This is, this is your warning. One more time and I'm going to have you leave.

Spiehs: So anyways, like I was saying, so when I did my protest, I was vilified around here and made it into a political matter, like it was [interrupted by Sellers]

Sellers: [interrupting and speaking over Spiehs] Point of order.

Spiehs: a baseless conspiracy theory, right?

Sellers: Point of order [while rolling her eyes]

Spiehs: so I came across an article here the other day. It's from June 26th of 2022. It's from the online journal Iperception. It's called "Mask wearing effects emotion perception". As I read through here I want you to think about this through the lens of what children went through while you all supported masking [interrupted by Larsen banging gavel and Sellers calling for point of order] and that's what it has to do with.

Sellers: [interrupting and talking over Spiehs] Point of order.

Larsen: [interrupting and talking over Spiehs while banging gavel] Sir, I'm going to, you are not speaking about something that is germane to the city. [Directing her comments to Sellers] Commissioner, please be quiet.

Spiehs: [continuing on while being interrupted by both Larsen and Sellers] You all put in a mask mandate.

Spiehs: No, no, no. Stop, stop. [interrupted by Larsen addressing Sellers]

Spiehs: You all put in a mask mandate that affected children [interrupted and talked over by Larsen] and as far as I'm concerned.

Larsen: [interrupting and talking over Spiehs]: Sir, you're done. This is your warning.

Spiehs: For what?

Larsen: This is your warning

Spiehs: For what?

Larsen: You are not talking about items that are germane to the city commission.

Spiehs: Horseshit I'm not.

Larsen: And you are done.

Spiehs: You are kidding, you got to be kidding me. You all put in a mask mandate [interrupted and talked over by Larsen]

Larsen: [interrupting and talking over Spiehs addresses the LEO] Officer, please remove this we'll step back for 5 minutes [rises up to leave the meeting room]

Spiehs: For what? For what? For what? [LEO removes Spiehs from the meeting and the city hall building].

44. The Commission enacted a mask mandate and the topic of "masks" has been discussed uninterrupted over 400 times by the Commission, its Committees, and public speakers prior to Mr. Spiehs' discussion of that topic that night.

45. The following speaker stated this:

> Speaker 13 (01:16:21): I know this item isn't on the agenda because it just happened and it's directly related to company business here. So we're going to talk about it. What just happened during the break in case everybody missed it, they stopped streaming during that, but I keep recording.  Justin Spiehs was talking. None of us really agree with everything he says, but he makes some good points every now and then. But he's talking this city commission can't just let him go for three minutes. They've got to interrupt him. They interrupted a person or two before 'em. Well at least one person. But this city commission once again, can't just sit for three minutes. So in the process of trying to throw him out, I stand up and I say, Hey, its his first amendment right to speak that might've been captured on the stream. Mayor started to reconsider, but then Ms. Sellers to jump in and demand that he be thrown out of the room. I may be getting some of this wrong because it just happened right in front of me and you know how the memory is, but damn, you guys can't sit and listen for three minutes….

46. Chris Flowers spoke as Speaker 14:

> Speaker 14 (01:19:30): Hi, this is Chris Flowers. And I would just like to say if masks aren't city commission meeting, does that mean in the future people can't say, Hey, we need people like diseases up. We need people wearing masks since it's no longer city commission meeting or city commission business. So I do not agree with what the speaker got thrown out with saying though I don't agree with that message.

47. On November 7, 2023, many speakers spoke on matters the Commission had no control over such as the Israeli / Gaza conflict.  And when the defendant Mayor Larsen stated that the matter was not germane, the speakers continued without interruption or being told to leave:

> Speaker 6 (01:05:21): Oh, the whole thing goes up. Okay. Thank you so much. Well, good evening. Members of the City Commission in Sala. My name is Philistine. Aine is Arabic Palestine. I'm a Palestinian American who has lived in Lawrence for 23 years. Today's my birthday. I wish I was celebrating like a normal person, but I

can't when there's so much violence happening to my people. For the past month, Gaza has been gripped by a horrifying crisis. One that has killed more than ma'am. It needs to be germane to the city business. I am. I'm getting there. Lawrence has this proud history of standing on the right side of history of advocating for justice and supporting humanitarian causes. I'm standing before you because last month I asked the city commission to continue this legacy by considering a resolution expressing solidarity with Gaza and advocating for ceasefire. Doing so will not only demonstrate our commitment to human rights, but also make our community stronger.

(01:06:11): And I thank the city in supporting us in our rally last month. I also thank our Jewish friends and colleagues in joining us on this mission. This request we're making is not antisemitic. It's crucial to emphasize that there is no room for antisemitism in the free Palestine movement. Our struggle for justice and solidarity with Palestine should never be equated with endangering Jewish lives. Israeli violence is what puts both Palestinian Jewish lives in danger. I would like the Lawrence City Commission and all present to think about how our resources and funds such as tax dollars are allocated in this conflict. We must ensure that they're not contributing to violence or aiding the IDF. It's vital to consider alternative ways to support peace, justice, and human rights in the region, including a citywide effort to participate in the BDS, which is Boy Kai sanctions movement.  For example, sometimes the IDF trains local, not ours, but police forces in other cities.

(01:07:00): I've covered this when I've worked in the news, I've learned that there's a chemical, an Israeli chemical company in Lawrence that makes phosphorus and white phosphorus is used on Gaza. So in conclusion, I would like us all to kind of think about what we can do with our local government to support Palestinians in this conflict. I hope that Lawrence will continue its tradition of standing for justice and compassion by expressing solidarity with Gaza and advocating for a ceasefire Together we can be part of this positive change making our community and the world a better place. Thank you so much for your time.

Speaker 8 (01:09:59): Good evening city commissioners. My name is Maria Perello and my public comment, I will be representing Sanctuary Alliance tonight and this does pertain to city business, so I will proceed with my comment hopefully without interruption. In the summer of 2019, many community members including myself, organized a rally in response to the horrific injustices occurring at our nation's border. That year, many folks bore witness to the violations of human rights that myself and fellow immigrants experienced throughout our lives. Families attempting to escape danger, poverty and political violence were separated at the border. Children were taken away from their parents, people were locked in detention centers. We witnessed the attempt of deportation of our community members all as a result for simply trying to seek safety. We got together and we said enough. In the following years, we worked with you commissioners and city staff to ensure our community remains safe against unlawful enforcement and unjust separation.

(01:11:04): We stated we are welcoming and safe to all regardless of your background, and we became a sanctuary city. Today we are witnessing yet another atrocity. In just the last month, there has been over 10,000 victims of intentional genocide in Gaza and due to a relentless air raids, there has been murder of over 4,000 children with many more missing and under the rubble of buildings that have been destruct. There are family members in this room tonight. From those places, all of us here are thinking and sick with worry about the many Palestinians who are in danger, who are separated from their families and who are facing an ethnic cleansing in their own lands. We see the horrifyingly similar effects in Palestine as we did not very long ago. Here in the United States at the border, even more we see the treacherous murder of innocent civilians that cannot be justified as self-defense. (01:12:03): Though it may feel out of reach to you and that their land is distant from ours, that does not mean that we do not have a responsibility to act, to make a declaration dedicated to safety for all people. Our tax dollars, our military, our exports are directly aiding a genocide. This is why on behalf of Sanctuary Alliance I'm asking commissioners to act Local leaders, Palestinian leaders have asked you to sign a resolution for an immediate cease fire and we support this act. We ask that you stay vigilant as a Islamophobia and antisemitism around the rise in all communities. This is not a religious conflict, but an attempt by the Israeli government to take land and gain power. When we say sanctuary for all, we mean sanctuary for all people everywhere and at every moment we say sanctuary for the people of Palestine. In order to do that, we encourage you to listen to these organizers to make a declaration for fire.

Speaker 2[Defendant Mayor Larsen] (01:13:05): Thank you. Thank you. Mell a free

Speaker 8 (01:13:06): Palestine. Thank you.

Speaker 2 (01:13:07): Next comment.

Speaker 8 (01:13:21): Good evening, city council. My name is Jen Van Nam. As a student at the University of Kansas and a resident of the city of Lawrence, I beg for a call of action. I beg the city of Lawrence to call for a ceasefire to stand behind the…

Speaker 2 (01:13:35): Ma'am it needs to be germane to business of the city. It does

Speaker 8 (01:13:38): Remain.

Speaker 2 (01:13:38): We can't call for a ceasefire?

Speaker 8 (01:13:42): So the city of Lawrence cannot say that they don't stand with the genocide of the Palestinian people?

Speaker 2 (01:13:48): Excuse me, I can't hear you.

Speaker 8 (01:13:49): The city of Lawrence, we can say that we do not condone the genocide of the Palestinian people can. We cannot sign a paper that says that we do not stand with the genocide of the Palestinian people? Vote for a ceasefire. We are calling for a ceasefire. That's what I'm asking. The city of Lawrence to do is to call for a ceasefire. We are grieving,

Speaker 9 (01:14:10): We are not okay and we are mourning, but we cannot do it freely because instead we are here pleading for humanity and begging people to see and understand our grief. I'm here again begging the city of Lawrence to call for a

ceasefire and stand against the genocide of the Palestinian people. As a community, we have been given the choice to be on the right side of history. Lawrence is known as a town built on stolen indigenous lands. So let's make sure that Lawrence is not also known as a town that stood for the extermination of the Palestinian people, the extermination of some of its own residents. It is easy to dissociate from the atrocities occurring overseas and we can easily shut off the news and continue living our privileged lives. It takes a great effort to keep up with the murders, to watch the videos of children being dug out of the rebel and hearing the cries of grown men weeping for their mothers. I am here begging the city of Lawrence to make an effort to call for a cease fire from the comfortable seats that you sit on and I beg the city of Lawrence to face the uncomfortable. For the remainder of my time, I'll be honoring those who have been murdered just this past month. A reminder to all that they are people with lives, with a history. They are not just numbers.

(01:15:31): Age 17, age 17. Age 16. Age 15. Age 14. Age. 13. 13. Age 12, age four, age 2, 2, 1. Age 78. Ahmed Shahin, age 73. AB Shahin, age 70 AB Ahmed Shahin, 68 Naima, Ah,

Speaker 8 (01:16:23): Thank you ma'am.

Speaker 9 (01:16:24): Age 65 Free Palestine.

Speaker 10 (01:17:48): Hello, my name is Nico and I'm here to plead with the Lawrence City Commission of Pass a resolution in support of the Palestinian people who are being eradicated As we speak today and collectively call for a ceasefire which can happen to stand here in this building that is comfortable and safe is a privilege to not use my voice loudly and clearly in the face of destruction and pain and horror is a severe disservice and I will not contribute to complacency. I have seen this genocide be called many other things including a war or a conflict. Instead of what it is, we all need to say it with our full chest. This is a genocide, this is an ethnic cleansing and this is complete oppression and I'm begging for Lawrence to show support for Gaza and to call for a ceasefire. Now it's already years too late because this situation is not new.

(01:18:35): We need to take accountability now and show empathy and compassion. There is a misconception that free speech on this topic is hate speech or antisemitic. I think it is crucial we separate the citizens from the government. It is not hateful to acknowledge an abuse of power and the victims of that power on both sides. How is this being rationalized? I am afraid to speak up at work or even wear a tire that supports the humanity of others because of the possible repercussions. Even though it is not political to acknowledge injustice, we as a city could change that narrative. Do not let propaganda and fear mongering sway you from the real cause, which is backing the oppressed, being a voice for those who aren't being listened to or making room for them. Each of us has a responsibility that doesn't start when those with more influence speak out.

(01:19:15): If even one person convinces another to speak up and that listener convinces others who convince others, we now have a crowd willing to push the status quo. This city has power and is only as strong as the citizens willing to push for change. I urge us to put pressure on the companies funding this genocide by

> joining the BDS movement and to make it clear that this is not a place for hate speech, but free speech everywhere the world begs for a ceasefire and to condemn oppressive powers free Palestine, pass the resolution in support of them and call for a ceasefire now while there is still the opportunity.
>
> Speaker 2 Thank you. Any other public comment?

48. Plaintiff Spiehs then spoke at the Commission that night after those speakers:

> Spiehs (speaker 11)(marker 01:21:09 in video):
> People speak and I didn't interrupt that sounds like unequal protection. So can I talk about masks tonight? So the study that I was going to talk about back in July on July 18th had to do with the fact that these masks were starting to be found out that they had remote. You're not going to stop me. Why aren't you stopping me? It's the same topic. You going to escort me out of here Now what's changed? What's changed?  Is it germane all of a sudden and talk about how the cost of living is higher right now with Biden as president than when Trump was president and Courtney stopped me and said, what does the city have to do with the NASDAQ? Well, what does the city, yeah, it's on video. What city have to do with the ceasefire? What can you do? How is it germane? What can you do? What policy are you going to put in place that's going to have anything to do with that? Why should our tax dollars go to that? Would you say that that's viewpoint discrimination? I think it is.

49. Despite repeating most of the statements made by Spiehs that resulted in the Mayor silencing and having him removed at a previous meeting, now the defendant Mayor Larsen arbitrarily did not do so at this meeting.

50. The following speaker Chris Flowers commented immediately following Spiehs:

> Chris Flowers (Speaker 2) (video mark 01:22:33):
> Yeah, this is Chris Flowers and I'm going to agree with Justin except I'm going to kind of disagree in that I think the ceasefire is germane, but I think the stuff he's brought up before has been germane and y'all do shut him down because of biasness and I just want to support the ceasefire people. But I'd also like to point out, mayor, you kind of did try to shoot it down and try to claim it's not city business. I just want to remind you, didn't you have the city write some kind of letter like when Trump was claiming the election wasn't, the election wasn't right or whatever. Didn't we write some kind of letter after that? So it's just kind of weird. We have written letters before we wrote a letter where we were against the pipeline. So writing a letter supporting a ceasefire is completely in line with city business and I think the reason you shut down the Palestine people is I think our mayor might stand with Israel.

51. After the plaintiff Spiehs spoke, other speakers again spoke on the "atrocities that are happening in Palestine," Palestinian Liberation Operation organization, the war in Yeoman, Ukraine, genocide, "Israel's genocidal assault on Gaza," "soap made from the bodies of dead Jews and photos of their mass graves," resolution for a ceasefire in Gaza, "Israel is not the only US ally currently engaged in ethnic cleansing," "US is nothing but an excuse to kill innocent lives," "government like Israel are the terrorist," "Israel has bombed the majority of hospitals in Gaza," "we are calling for a ceasefire. Stop saying you can't do anything about it," and "Biden has and the administration has pledged more billions of dollars to Israel."

52. Those speakers were arbitrarily permitted by defendant Larsen to finish their statements and were not removed from the building because of those statements.

53. Speaker 21 stated "This is the bias of a mayor that can't stand to listen to people. Talk about people dying.  Why do you let your bias show so clearly? Why can't you sit there and just listen? You bang that gavel several times where people couldn't even hear it banging as I was saying."

54. The speakers appearing before the Commission have had different understandings as to what "germane to the business" means. Even the conduct and statements of the defendant Mayors indicate arbitrary understandings of that phrase.

55. Depending on the whim, mood, animosity, political position of a defendant Mayor on any particular open meeting, speakers such as plaintiff Spiehs may engage in speech to the Commission without interruption and then, at a different Commission

meeting, the same speech is suppressed with consequences of punishment of ejection from the building.

*Incidents at the Lawrence Public Library*

56. The Lawrence Public Library is a public forum.

57. On May 17, 2023, the public was invited to an event hosted by the Library about the topic of "gender markers" related to legal documents. This event was held in anticipation of the Kansas gender legislation that would take effect on July 1, 2023.

58. The Lawrence Times stated that "the Lawrence Public Library is teaming up with Kansas Legal Services to hold a free clinic to help transgender people get their gender markers changed on their Kansas birth certificates and IDs."

59. The paper stated the "clinic will be a hybrid in-person and online info session. It's set for 6 to 7:30 p.m. Wednesday, May 17 in the library auditorium, 707 Vermont St. Join the meeting virtually via Zoom at this link. Learn more on the library's event page."

60. The Libraries event page https://tinyurl.com/5b8vpa7h stated:

> In partnership with Kansas Legal Services, join us for an emergency informational session about getting gender marker change paperwork submitted and processed before Senate Bill 180 goes into effect this summer. Ellen Bertels, Kansas Legal Services Attorney, will lead a presentation about the current pathways to making gender marker changes on state-issue ID & documentation in KS on your own (pro se). Kansas Legal Services can help to answer your questions about changing names and amending gender markers on birth certificates, social security records, passports, and KS identification cards and driver's licenses.

61. The site further stated:

> The zoom link for the virtual meeting is here: https://lplks.zoom.us/j/92928252034
> About the presenter: Ellen Bertels is an attorney at Kansas Legal Services' Wichita office providing pro bono representation to transgender and nonbinary Kansans

undergoing legal identity document corrections. Questions? Ask Marc: mveloz@lplks.org or Ellen: bertelse@klsinc.org.

62. Mr. Spiehs attempted to enter the Library with a sign that read "If you have a dick then you are not a chick." Mr. Spiehs friend attempted to enter the library with a sign that stated "God didn't get it wrong. There are only 2 genders" with male and female gender signs drawn on it.

63. Mr. Spiehs did not plan on verbally communicating anything but rather to sit silently while displaying those signs. Upon entry into the library, Spiehs and his friend initially stood silently at the entrance of the Library auditorium in which the event was to be held.

64. When the Library auditorium doors opened for the public, Mr. Spiehs attempted to enter but then was confronted by library employee Marc Veloz.  Mr. Veloz attempted to stop Mr. Spiehs from entering.  The doors to the auditorium were then locked from the outside with attendees of the event inside the Library auditorium further preventing Mr. Spiehs' entry.  Multiple library employees gathered around Mr. Spiehs and his friend while they were physically prevented from entering the Library's auditorium.

65. Among the employees were Kathleen Morgan, Sarah Mathews, and an unidentified private security guard.  They all insisted that Mr. Spiehs and his friend could not attend the event displaying the signs.

66. Police arrived and it was determined that Mr. Spiehs' sign was "obscene" and that he could not enter the Library Auditorium displaying it.

67. On June 11, 2023, the Library hosted "Deja's Reading Rainbow."  It was reported by the Lawrence Times with the following caption:



68.  The paper stated:

Deja Brooks, a local drag artist, will read and perform at the free event, set for 3:30 p.m. Sunday, June 11 at the Lawrence Public Library. The event will last about an hour, according to the Facebook event page.
Deja's Reading Rainbow is "a story time about love and friendship, being different and belonging, being unique and being accepted, colors, rainbows, and, of course, fun," according to the event page.
The event is open to all ages, according to the library.

69. The Library reported the event as follows:



70. The event is where a male adult "Deja Brooks" (real name Brandon Isman) dresses up as a woman and reads stories to children.  Mr. Spiehs and three of his friends planned to silently attend the event while displaying their signs.  Mr. Spiehs' sign stated "This is Wrong" and "Stop Grooming Kids."

71. Another sign of one of the friends stated "Deja is a Soul-less Parasite." But immediately upon entering the Library,  Mr. Spiehs was again confronted by the same private security guard from the May 17th event.  He told Mr. Spiehs that "we've been over this before with the signs" and he insisted that Mr. Spiehs could not attend the event if a disturbance was made.  Mr. Spiehs stated that he was not going to be a

disturbance.  Mr. Spiehs waited outside the same Library auditorium as the May 17th event.

72. While waiting for the doors to open, the security guard and library employee Erica Segraves stood nearby and appeared to be reviewing some kind of library literature or policy. Those two individuals then were joined by library employee Phillip Howard and another unidentified library employee. When the doors to the event were opened, Mr. Spiehs entered with his signs and proceeded to sit together as a group.  As they sat waiting for the start of the event the unnamed security guard and another library employee. Erica Segraves continued to group with the other employees looking at a paper.

73. Mr. Spiehs entered the auditorium. Mr. Spiehs placed his signs in the purse of one of his friends. Then when the event started they silently displayed their signs. Performer Deja Brooks then demanded that Mr. Spiehs' friend put her sign away. The private security employee then confronted Mr. Spiehs and claimed that Mr. Spiehs was being disruptive although Mr. Spiehs had not said anything.  The Library employees were close by and watched while this occurred.

74. The security employee stated that Mr. Spiehs had to leave or he would call the police and have Mr. Spiehs cited for trespass.  Up to that point neither Mr. Spiehs nor his friends had said anything.  Then two Lawrence Municipal police officers entered the auditorium.

75. Because of the demand of the security officer and the presence of police, Mr. Spiehs complied and left the Library.  The security guard also initially demanded

that all the people sitting with Mr. Spiehs had to leave but they insisted that since they didn't have any signs that they didn't have to leave.  They were allowed to remain at the event.

## FIRST CAUSE OF ACTION
**Violation of Plaintiff's First Amendment Right to Freedom of Speech**
**Declaratory and Injunctive Relief**
**Facial Challenge**

76. Under 42 U.S.C. §§ 1983 and 1988, Mr. Spiehs is entitled to appropriate relief invalidating Defendants' challenged policy and related conduct.

77. At all times relevant to this Complaint, each and all of the acts and policy alleged herein were attributed to Defendants who acted under color of a statute, regulation, or custom of the State of Kansas (i.e., under color of state law and authority).

78. The Commission has delegated to each Mayor authority at the public meetings. This formal authority continues under current policy and constitutes an ongoing standard operating procedure of the Commission.

79. Mayor Larsen and Mayor Shipley had final policy making authority regarding the suppression of Mr. Spiehs' speech and his repeated removals from the building during a Kansas Open Meeting. Their respective acts itself constituted an act of official government policy of the Commission.

80. Each Commission member who had final policy-making authority ratified Mayor Shipley's and Mayor Larsen's unconstitutional actions.

81. A First Amendment violation centers on three questions: (1) whether speech is protected, (2) the type of forum, and (3) the justification for restricting speech.  *See*

*Summum v. Callaghan*, 130 F.3d 906, 913 (10th Cir. 1997).  Plaintiff's speech on each occasion cited in this Complaint was protected speech.

82. At the injunction and trial level, the burden is upon defendants to justify their actions. *See Greater Phila. Chamber of Commerce v. City of Phila.,* 949 F.3d 116, 133 (3d Cir. 2020) (In "First Amendment cases the initial burden is flipped"); *See Ashcroft v. American Civil Liberties Union,* 542 U.S. 656, 660 (2004) (same). The government bears the burden of proving the law is constitutional, tracking the burdens at trial. *Id.*

83. Each defendant bears the burden to show each and every reason each defendant suppressed Mr. Spiehs' speech and his subsequent removal was Constitutional. *See Kennedy v. Bremerton School District*, 142 S. Ct. 2407, 2426 (2022) ("Whether one views the case through the lens of the Free Exercise or Free Speech Clause, at this point the burden shifts to the District").

84. Defendants cannot sustain their burden that each of their actions was Constitutional.

85. The Commission's speaking policy is unconstitutionally vague for these reasons: first, it does not provide people of ordinary intelligence with reasonable opportunity to know what is prohibited; and second, it authorizes arbitrary or discriminatory enforcement. The General Public Comment Resolution is unconstitutionally vague. Speakers under the General Public Comment Resolution are allowed to "speak on items not scheduled for discussion on any agenda prepared for that meeting." While the Specific Comment portion is limited with the language "*shall be* germane" the

General Comment portion is not so limited.  It states the "General Public Comment *should be* limited to issues and items germane to the business of the Governing Body."

86. It appears from the difference in "should" and "shall" language that General comments are recommended to be germane while during the specific comment part the germane restriction is a requirement.  Because the words "should" and "shall" are used in the same Commission speaking policy, the terms should be distinguished. "Should" means that germane was only advisory and permissible while "shall" should be interpreted as mandatory.

87. And taken as a whole, the phrase "should be germane to the business of the Governing body" is unconstitutionally vague.  Defendants cannot sustain their burden to show that the suppression of plaintiff's speech or his removal under the Speaking policy was Constitutional.

88. The restrictions "slander, speech invasive of the privacy of individuals, unreasonably loud or repetitive speech" are unworkable, unreasonable, and overbroad and vague.

89. The restrictions on content are not reasonable given the nature of the forum which includes proclamations on a wide variety of topics over which the Commission has no control over yet seeks to influence.  The restrictions are not viewpoint neutral when taken as a whole considering all of the activities of the Commission.

90. The defendants' policy and related practices are not narrowly tailored as applied to Mr. Spiehs because Mr. Spiehs' expression does not implicate any of the legitimate interests any defendant might have.

31

91. Unless the policy and conduct of the defendants are enjoined, Mr. Spiehs will continue to suffer irreparable injury to his First Amendment rights to petition government and to engage in protected speech.

## SECOND CAUSE OF ACTION
**Violation of Plaintiff's First Amendment Right to Freedom of Speech
Declaratory and Injunctive Relief
As Applied Challenge**

92.  Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

93. The Commission's forum was opened so widely that there were practically no subject-matter limitations. This undermines any legitimacy to the Commissions' interest in curtailing off topic speech in the General Comment section of the meeting.

94. The Commission's speaking policy has been applied to the plaintiff Spiehs in a discriminatory and disparate fashion.  Numerous other speakers are permitted to give the same speech in topic and substance as plaintiff Spiehs did on October 11, 2022, and July 18, 2023, without interruption, suppression of the speech, or removal from the building as a result of the speakers respective speeches.

95. The defendant Mayors have arbitrarily interpreted the Policy to suppress and punish the content and viewpoint of Spiehs' speech on those dates.

96. There is a credible or objectively justified fear of future enforcement of the Policy because there has been a past enforcement of the same statute or provision for the same conduct.

97. As stated by the current defendant Mayor, the phrase germane to the business activities" is vague and subjective.  It is purposely designed to permit the unguided

and arbitrary enforcement according to the particular interpretations of any given Mayor presiding over the Commission meetings. It is "irreparably clothed in subjectivity" and provides no standards to guide a Mayor's discretion. *Marshall v. Amuso*, 571 F. Supp. 3d 412, 424-25 (E.D. Pa. 2021).

## THIRD CAUSE OF ACTION
### Violation of Plaintiff's First Amendment Right to Freedom of Speech
### Retaliation
### (42 U.S.C. § 1983)

98. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

99. Defendants each viewed Mr. Spiehs as someone who emboldened other speakers to express viewpoints the members of the Commission did not want to hear. Mr. Spiehs was clearly the most infamous and antagonistic speaker appearing before the Commission prior to October 2022 and afterwards.

100. The defendants targeted Mr. Spiehs because of his status and viewpoints and used each respective Mayor's animosity and predispositions against plaintiff Spiehs and his political viewpoints to have the speaking policy arbitrarily interpreted in a discriminatory manner in order to deter expression of certain political positions, then punish and make Mr. Spiehs an example to the community.

101. One example among many: Mayor Larsen retaliated against Spiehs because he called her out on "misgendering" which embarrassed Larsen ("I think you misgendered that they there, Mayor"). The defendants prohibit Mr. Spiehs from handclapping which is retaliatory. Defendants violated their own rules when applied to Mr. Spiehs which is retaliatory.

102. Even the other public speakers contemporaneously recognized the disparate and retaliatory treatment handed down by each defendant Mayor. Mayor Shipley heard essentially identical speeches given by different speakers about politics: the differences between Joe Biden and Donald Trump – yet punished Mr. Spiehs for the same speech while not doing so with other speakers. Mr. Spiehs was punished for talking about masking, a subject that had come up repeatedly in numerous prior meetings in which those speakers were not interrupted or marched out of the building for talking about masking.

103. Each time the respective Mayor banned Mr. Spiehs from further attendance that night at each open meeting constituted a prior restraint on speech which was further evidence of retaliation because removing Mr. Spiehs from the building is not reasonable or necessary simply because the Mayor believed Mr. Spiehs purportedly spoke off-topic.

104. Barring Mr. Spiehs from attending or addressing the Commission at the later Public Comment section that evening is functionally a prior restraint, which is presumptively unconstitutional. *Neb. Press Assoc. v. Stuart*, 427 U.S. 539, 592 (1976). The Commission preemptively banned Mr. Spiehs from speaking at a later public speaking section each evening which is unconstitutional. *See Mnyofu v. Bd. of Educ. of Rich High Sch. Dist. 227,* No. 15 C 8884, 2016 U.S. Dist. LEXIS 45773, at *2 (N.D. Ill. Apr. 5, 2016) (The Commission shut off the microphone in the midst of a citizen activist's speech).

105. The ban prevented plaintiff Spiehs from the ability to have his grievances addressed at this forum.

106. The actions of the defendants were unreasonable, not narrowly tailored because prospectively banning a speaker without proof of dangerousness interferes with the speaker's right to interact with elected representatives. *See Reza v. Pearce,* 806 F.3d 497, 500-01 (9th Cir. 2015).  Under this policy, Mr. Spiehs was and continues to be subjected to open meeting bans for a purported speech code violation without any evidence of disruption or danger to anyone.  This objectively and unreasonably chills speech.  *See Walsh v. Enge,* 154 F. Supp. 3d 1113 (D. Or. 2015) (court enjoined enforcement banning speakers from city council chambers).

### FOURTH CAUSE OF ACTION
**Violation of Plaintiff's First Amendment Right to Freedom of Speech
Content & Viewpoint Discrimination
(42 U.S.C. § 1983)**

107. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

108. The defendants suppressed and removed Mr. Spiehs because of the viewpoints he expressed at the Commission meetings.

109. As Nicole accurately stated at the Commission meeting, the defendants were "trying as hard as you can to censure any viewpoints that oppose the Democrat narrative."

110. The defendants prohibit Mr. Spiehs from hand clapping after a speaker completes his or her speech which hand clapping is a communicative activity.

111. Hand clapping of any sort or volume after a speech is completed is a positive viewpoint communication and does not disrupt the meeting or the flow of speakers as it does nothing to impede the next speaker from approaching or starting her or his speech.

112. The Commission policy does not contain any prohibition on non-verbal communications by persons attending an open meeting and the prohibition is viewpoint discrimination as well as arbitrary and unreasonable.

113. The defendants' respective actions targeted certain viewpoints on a subject matter such as presidents, national or county politics. They targeted Mr. Spiehs' particular views on those topics. Defendants restricted and punished Mr. Spiehs' views because of their respective specific motivating ideology, opinion, and perspective.

114. Defendants restricted and punished Mr. Spiehs' views because of his specific motivating ideology, opinion, and perspective.

115. Each defendant acted with a viewpoint-discriminatory purpose when Mr. Spiehs' speech was suppressed.

116. Each defendant acted with a viewpoint-discriminatory purpose when Mr. Spiehs was removed from the building and banned from returning that night.

**THIRD CAUSE OF ACTION**
**Violation of Plaintiff's First Amendment Right to Freedom of Speech**
**Compelled Speech**
**(42 U.S.C. § 1983)**

117. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

118. The Commission allows hand clapping at other parts of the Commission meeting when recognizing proclamations, employees, or other individuals being recognized or awarded.

119. It is recognized that handclapping – or the lack thereof – can communicate relative approval, disinterest, or disapproval of a particular action or speech taking place. The defendants prohibit Mr. Spiehs from hand clapping after a speaker completes his or her speech which hand clapping is a communicative activity. Prohibiting Mr. Spiehs from handclapping after a speaker makes him appear either disinterested or disapproving of the speech.

120. Hand clapping after a speech does not disrupt the meeting or the flow of speakers as it does nothing to impede the next speaker from approaching or starting her or his speech.

121. By prohibiting Mr. Spiehs from communicating approval of a speaker's message by hand clapping, it compels Mr. Spiehs' non-verbal communication.  The prohibition to his non-verbal behavior compels Mr. Spiehs to indicate approval or disapproval by removing his ability to communicate those things non-verbally after each speech. This prohibition compels Mr. Spiehs to convey the government's message.

**FIFTH CAUSE OF ACTION**
**Violation of Plaintiff's Fourteenth Amendment Right to**
**Equal Protection of the Law**
**(42 U.S.C. § 1983)**

122. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

123. Plaintiff is a "class of one" and alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215-16 (10th Cir. 2011).

124. "A violation of equal protection occurs when the government treats someone differently than another who is similarly situated." *Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence*, Kan., 927 F.2d 1111, 1118 (10th Cir. 1991).

125. Mr. Spiehs has named specific speakers in this Complaint who are comparators – similarly situated – to Mr. Spiehs when speaking at the General Comment section. Each speaker labors under the same Policy requirements as Mr. Spiehs but perhaps not as applied.  Each public speaker dresses in an individual manner.  Each speaker waits his or her turn to approach the podium.  No speaker is required to be a resident – and the only requirement is that the speaker provide a name – whether true or an alias. Speakers speak on the same topics that Mr. Spiehs spoke on yet without interruption or removal from the meeting. These speakers are similar to Mr. Spiehs in all material respects.

126. The defendants have taken the position that "germane to the business" means that the subject or topic must be something the Commission can exercise control over.

127. But the proclamation activities of the Commission contradict that interpretation. The so-called business activities of the Commission encompass speaking on an unlimited range of topics of which the Commission will adopt certain political viewpoints to those topics.  Thus the business persuasion or signaling

activities of the Commission concern their chosen viewpoints and addressing topics and matters well beyond their control.

128. So if the business activities of the Commission involve staking out worldwide or national political or moral positions far beyond the actual legislative power of the Commission, then public speakers are well within that activity to express their viewpoints – opposing viewpoints – on anything.  These speeches by those named in this Complaint, as well as other speakers, are allowed to speak on a variety of topics which the Commission has zero control over – unless one is named Justin Spiehs.

129. The prior facts stated in this Complaint show all kinds of topics that do not fit the stated interpretation of "germane to the business" Policy restriction which were not met with interruption, termination, or ejection from the building.

130. And in fact even when the speaker is confronted with a Mayor's claim that the topic is not germane, the Mayor still allowed that speaker to complete the speech and did not remove the speaker because of the purported off-topic violation.  The disparate treatment is apparent: for those not named Justin Spiehs the Mayor displays remarkable restraint for the speaker's viewpoint but not so for the plaintiff Spiehs.

131. Ms. Spiehs is similarly situated to other public speakers who speak at a public comments open meeting before the Commission.

132. Defendants have chosen to take no adverse action against speakers who support or endorse the viewpoints of the defendants, but they take adverse action against a speaker like Ms. Spiehs who has different viewpoints and brings up subjects that are personally offensive to a Commission member.

133. After taking the many adverse actions against Ms. Spiehs for a purported speech code violation, the defendants have knowingly refrained from taking the same adverse actions against other speakers who have purportedly violated the speech code in the same manner or in discussing the same topics and viewpoints as the plaintiff Spiehs.

134. Defendants' customs, practices, and their enforcement have also been applied to discriminate intentionally against Ms. Spiehs' rights to freedom of speech, right to be free from compelled speech, right to be free from unconstitutional conditions, and right to due process of law. Thus, discriminatory intent is presumed.

135. Defendants' Policy and related practices are underinclusive, prohibiting some expression while leaving other expression equally harmful to Commission's asserted interests unprohibited.

136. Defendants applied their Policy and related practices to Mr. Spiehs in a discriminatory and unequal manner, granting other speakers the right to express their views on the same topics and subjects as Mr. Spiehs attempted to speak on while denying that right to M. Spiehs, in violation of Mr. Spiehs' right to equal protection of the law under the Fourteenth Amendment.

### SIXTH CAUSE OF ACTION
### The Library Defendants
### Violation of Plaintiff's First Amendment Right to Freedom of Speech
### Content & Viewpoint Discrimination
### (43 U.S.C. § 1983)

137. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

138. Mr. Spiehs has a First Amendment right to access this public library which is a designated public forum. *See Doe v. City of Albuquerque*, 667 F.3d 1111, 1129 (10th Cir. 2012) (public library is a designated, rather than a limited, public forum). Regulations on speech in public and designated public forums require more exacting scrutiny. *Cole v. Goossen*, 402 F. Supp. 3d 992, 1013 (D. Kan. 2019).

139. The public was invited to both library events. This Count implicates two distinct First Amendment interests: Mr. Spiehs right to engage in speech by displaying his signs, and his right to receive information through attendance at the Library events.

140. Mr. Spiehs had a right to receive information and to communicate information at the library event – both of those rights were unconstitutionally taken away the Library defendants. Both of Mr. Spiehs' signs were protected speech under the First Amendment.

141. Mr. Spiehs use of the word "dick" rhyming with "chick" is purposeful biological and cynical witticism.  It is wholly truthful as the message is biologically sound. While Mr. Spiehs' wit may strike persons as innocuous, humorous, or vulgar, it is not obscene.  A chief "function of free speech under our system of government is to invite dispute," which commonly "induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Texas v. Johnson*, 491 U.S. 397, 408-09, (1989).

142. There is no question that these two interests are protected under the First Amendment. *See Stanley v. Georgia*, 394 U.S. 557, (1969) ("Constitution protects the right to receive information and ideas"); *Board of Educ., Island Trees Union Free Sch.*

*Dist. No. 26 v. Pico,* 457 U.S. 853, 867 (1982) ("right to receive ideas follows ineluctably from the sender's First Amendment right to send them").

143. Mr. Spiehs did not interrupt any speaker and none of his signs being displayed in silence did not actually disrupt any speaker from continuing to speak. Mr. Spiehs did not engage in stomping of feet, whistling, making noise, or yelling.

144. Speech in a public forum cannot be discriminated against based on viewpoint, and the restriction must be "reasonable in light of the purpose served by the forum." *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.,* 473 U.S. 788, 806 (1985).

145. The quiet display of either of Mr. Spiehs' signs did not prevent other patrons from enjoying the library and did not otherwise endanger them through the display of his biological or political message on his signs.

146. The fact that this was viewpoint discrimination is evident: had Mr. Spiehs displayed a blank sign or signs that supported the transgender movement there would have been no adverse action taken against him by the Library employees.

147. The Library has a "Behavior Policy" published at https://tinyurl.com/2u6.

148. The Library prohibits "using obscene, threatening, harassing, or abusive language or gestures – including abusive language and gestures directed at race, ethnicity, sexual orientation, ability, gender and identity, and other personal characteristics."

149. The terms "harassing," "abusive," "gestures" are unconstitutionally vague leaving the speech subject to a Heckler's veto. "Gender," "identity" and "other personal characteristics" are also unconstitutionally vague.

150. Whatever policy the Library employees were utilizing to prohibit Mr. Spiehs entry in to Auditorium or to suppress the quiet display of his signs, as applied to Mr. Spiehs this was intentional viewpoint discrimination.  Mr. Spiehs was in compliance with any time, place, and manner restrictions the Library had that could have been reasonably and Constitutionally imposed by it upon Mr. Spiehs.

151. According to library personnel, Mr. Spiehs' first denial of access to the Library Auditorium was because of some prohibition against obscenity but Mr. Spiehs' sign did not meet the legal definition of being obscene.

152.  On both occasions the Library was advancing or promoting a message regarding transgenders.  It permitted the speakers to engage in a particular viewpoint on that topic but would not allow Mr. Spiehs to communicate silently through a sign a viewpoint the Library and it's the Library Defendants did not like.

153. The Library Defendants and each Library defendant purposed to suppress Mr. Spiehs' expression merely because public officials oppose his view on the topics being discussed at those two library events.

PRAYERS FOR RELIEF

WHEREFORE, the plaintiff requests that judgment be entered in his favor and against each defendant as follows:

A. An order enjoining defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from ejecting or otherwise removing plaintiff Spiehs or

any public speaker solely because of a claim by the Commission or the Mayor that the speech was off-topic;

B. An order enjoining the Library Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from ejecting or otherwise removing plaintiff Spiehs from library events because of the silent display of a sign containing protected speech;

C. An order enjoining defendants from enforcing the Commission's policy of "should be germane to the business" because it is advisory and not mandatory and is subject to unbridled discretion by a presiding Mayor in its interpretation and unconstitutionally vague;

D. An order enjoining defendants and Library Defendants from enforcing the Commission's or Library's other speech prohibitions or being removed as a consequence of violating the Commission's or Library's speech code;

E. Declaratory relief consistent with the injunction, to the effect that the Commission Policy and Library Behavior Code with its speech prohibitions described above are unconstitutionally void and unenforceable as they violate the First Amendment rights of free speech and petition, and the Fourteenth Amendment's guarantee of due process against vague laws;

F. An award of actual damages to the plaintiff;

G. An award of nominal damages to the plaintiff.

H.  Against each individual defendant in their individual capacity an award of punitive and exemplary damages to the plaintiff;

I.  Cost of suit, including attorney fees and costs pursuant to 42 U.S.C. § 1988 and any other relief as the Court deems just and appropriate.

DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury for all issues so triable herein.

/s/Linus L. Baker
Linus L. Baker, KS 18197
6732 West 185th Terrace
Stilwell, KS  66085-8922
Telephone:  913.486.3913
Fax:            913.232.8734
E-Mail: linusbaker@prodigy.net
Attorney for the plaintiff
