IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| Justin Spiehs | Case No.   5:23-cv-04107-JAR-BGS |
| Plaintiff | |
| v. | |
| | PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT |
| Lisa Larsen *et al* | Request for Oral Argument |
| Defendants | D. Kan. Rule 7.2 |

**PLAINTIFF JUSTIN SPIEHS MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**STATEMENT OF FACTS**

**RETALIATION**

1. Dr. Spiehs began reporting on and then criticizing defendants Courtney Shipley and Lisa Larsen as a citizen journalist in April 2022.  Ex. 4, (sworn statement of Dr. Spiehs)  ¶¶ 11-15.

2. During these meetings Dr. Spiehs listens, makes observations, and at times questions other attendees and speakers in real time for reporting purposes. Ex. 4 ¶12.

3. Dr. Spiehs confronted then mayor Shipley in a September 2022 meeting about her racism and racists comments made regarding not appointing white board members because they were white.  Dr. Spiehs then published in a September YouTube video calling out Shipley as a racist with racist policies. Ex. 4 ¶13.

**GENERAL COMMENT PORTION OF THE CITY COMMISSION MEETINGS CONSTITUTES A DESIGNATED PUBLIC FORUM**

4. Defendant Courtney Shipley was asked in an interrogatory 21 to "identify your understanding of the meaning of business of the Governing body, fighting words, slander, speeches invasive of the privacy of individuals, unreasonably loud or

1

repetitious speech, and disruptive speech as those words or phrases may be referred

to in the City's Resolution Nos. 7451 or 7496. Ex. 1, p.3 (Question 21).

5. In response, Shipley stated:

"Business of the Governing Body" refers to the City of Lawrence's business.
"Fighting words" means words that are threats of physical violence or harm.
"Slander" are untrue statements that can damage someone's reputation.
"Invasive of privacy" means speech that invades someone's personal information.
"Unreasonably loud speech" is speech in high volume in a way that is unreasonable.
"Repetitious speech" is speech that is duplicative or saying the same thing over repeatedly.
"Disruptive speech" is speech that is timed or designed to interfere for example with a City of Lawrence meeting.

Ex. 1, p.4.

6. Defendant Lisa Larsen was also asked the same question in interrogatory 21 to

which she stated:

"Business of the Governing Body" means those issues for which the City had purview over.
"Fighting words" means threatening or attacking words that have a propensity to cause violence.
"Slander" means statements that are untruthful and hurtful to reputation.
"Invasive of privacy" means words that breach or invade that which is personal to the individual.
"Unreasonably loud speech" is speech that is significantly louder than normal and designed to interrupt.
"Repetitious Speech" is speech that says the same thing or makes the same point again and again.
"Disruptive Speech" in this context is speech that prevents a meeting from continuing in a normal manner.

Ex. 2 p.4.

7. In a story by the Lawrence World Journal it referred to Dr. Spiehs "who was

removed from past City Commission meetings" and the issue of "whether the City

Commission was being fair in how it determined which topics were germane to city business." Ex. 3 (LJWorld Article).

8. When questioned, Larsen stated that "the issue of what is considered a germane topic is very subjective, and the city doesn't have a policy that provides clear guidelines on the topic. Instead, she said each commission is given wide latitude to make that determination, which she said can be difficult." Ex. 3.

9. At a February 13, 2024, hearing in this Court both defendants Shipley and Larsen testified under oath. Ex. 4 (Dr. Spiehs' sworn statement) ¶2.

10. Defendant Larsen testified that she gave that statement to the LJWorld reporter. Ex. 4, ¶2.

11. Individuals could attend the meetings wearing messages on shirts or signs that she considered were not germane to the business of the City. Larsen testified that the activities of the Commission in determining proclamations, making proclamations, and getting constituent input, was part of governing the City of Lawrence.  She also testified that there was no removal language in Resolution 7496. Ex. 4 ¶3.

12. Larsen claims she misunderstood Dr. Spiehs' speech about the city's masking policy. Ex. 4 ¶3.

13. Both Shipley and Larsen interpreted "business" in the phrase "germane to the business of the governing body" differently with different outcomes had they been the presiding mayor at the meetings Dr. Spiehs was silenced and ejected from.  Ex. 4 ¶5.

14. Larsen testified at the hearing that "germane to the business" was subjective while Shipley testified that she thought it was objective and she would not have silenced or removed Dr. Spiehs from the July 18 meeting. Ex. 4 ¶¶5 &6.

15. Larsen would not have silenced or had Dr. Spiehs removed at the October 11 meeting had she been the presiding Mayor.  Ex. 4 ¶7.

16. Shipley said her only reason for removing Dr. Spiehs from the October 11 meeting because she interpreted Dr. Spiehs' speech as not being connected to any business of the City.  Ex. 4 ¶7.

17. However, Larsen testified at the hearing that Dr. Spiehs' speech topics was connected to the business of the City and had she been presiding Mayor she would permitted Dr. Spiehs to finish his speech and not be ejected. Ex. 4 ¶8.

18. When Shipley used the phrases "welcome you to leave this room" or "you're welcome to leave" Dr. Spiehs understood it to mean she was only making suggestions and not commanding Dr. Spiehs to be quiet or leave.  Ex. 4 ¶9.

19. Shipley interpreted the word "should" in the general comment section as "shall" but she didn't know why the policy used the words differently in the same policy. Ex. 4 ¶10.

20. Shipley did not interpret and enforce the germane to the business language the same way as presiding mayors before or after her. Ex. 4 ¶10.

21. The Lawrence City Commission or the office of the Lawrence City Mayor routinely solicits or obtains suggestions from individuals regarding possible topics for a Mayor's

official proclamation. ECF 1 (Complaint); ECF 11, p.10 (sworn verification of Complaint). Ex. 4 ¶¶ 2, 3, 8, 9, 21; Ex. 2.

22. Proclamations are placed on the City Commission's public meeting agendas. Ex. 2 (May 9, 2023 Agenda).

23. The Commission has allowed individuals to speak advocating for the adoption of a proclamation. Ex. 4. ¶¶ 3, 20 (#74 (marijuana) #75 (Bicycle day) #201 (week without driving).

24. In the May 9, 2023, open meeting, the Commission recognized June 2023 as LGBTQ+ Pride Month, May 2023 as Historic Preservation Month, May 7-13 2023 as Public Service Recognition Week, May 2023 as Building Safety Month, and May 7-13 2023 as National Travel and tourism Week. Ex. 2, pp. 1 & 2.

25. It is the business of the City Commission to take suggestions from or solicit from citizens input regarding possible topics for official proclamations made by the City Commission. Ex. 4. ¶¶ 3, 20-21.

26. It is the business of the City Commission to vote upon official proclamations on various topics. Ex. 2.

27. In 2023, the board conducted 34 public meetings. In 2024 (through 9/10/24), the Board conducted 21 open meetings. Of those meetings the number of individuals who expressed statements of which the board had no ability to legislate or make ordinances about the topic or subject matter was 105 in 2023 and 33 in 2024. Ex. 4 ¶¶16.

28. The presiding mayor of the board allowed these statements made by 100 out of 105 individuals (95.2%) in 2023 without any interruption and in 2024 31 out of 33 (93.9% of those individuals. Ex. 4 ¶17.

29. In 2023, of the 5 interruptions made by the presiding mayor indicating the statements were not germane to the Board's business, 2 individuals were nevertheless permitted to continue speaking on the same subject. In 2024, 2 of 33 speakers were interrupted and neither was permitted to continue speaking on the subject. Ex. 4 ¶18.

30. Of the 3 statements made by individuals in 2023 that were interrupted by the presiding mayor and not allowed to continue to speak on the subject, one speaker was removed from the meeting while the other two speakers were allowed to remain.  Of the 2 speakers interrupted and not permitted to finish speaking in 2024, one speaker was allowed to remain while the other speaker was ejected from the meeting by the presiding mayor. Ex. 4 ¶19.

31. On October 4, 2022, the City Commission adopted Resolution No. 7451 which stated in part that "General Public Comment should be limited to issues and items germane to the business of the Governing Body" and "Public Comment on a specific item shall be germane to the item being discussed."  Ex. 5.

32. Resolution No. 7451 also stated "The following will not be tolerated: fighting words, slander, speech invasive of the privacy of individuals, unreasonably loud or repetitious speech, and speech so disruptive of the proceedings that it substantially

interferes with the Governing Body's ability to conduct the business of the City." Ex. 5.

33. Resolution No. 7451 also stated "Any member of the public engaging in disruptive behavior that substantially interferes with the Governing Body's ability to conduct the business of the City may, after a warning, be subject to removal from the meeting." Ex. 5.

34. On October 11, 2022, at the Commission's open meeting presided over by the defendant Shipley, Dr. Justin Spiehs spoke stating: "I'm running for Douglas County commissioner in district 1 as a Republican candidate. I want to go over some numbers with you guys here. This, these are the numbers on the last day that Trump was in office and how things are today. So on the last day that Trump was in office the inflation rate was at 1.4%, today it's at 8.3%, that's a little low. Gas was a national average of $2.39 when Trump was in office, today it's $3.76. The 30 year mortgage rates were at 2.65% today they are at 7.08%." ECF 1 p.10; ECF 11, p.10 (sworn verification of Complaint).

35. Defendant Shipley interrupted Dr. Spiehs saying "is there some way that we have control, is there some way that this city commission has control over inflation?" ECF. 1 p.10.

36. Dr. Spiehs stated "I'd like to make this a proclamation of how stupid Democrats are. Thank you. The average rent prices were $1,625, today they are at $2,039. The NASDAQ was up 13,322 points." ECF 1 p.10.

37. Defendant Shipley interrupted Dr. Spiehs stating "is there some way this city commission has control over the NASDAQ?" ECF 1 p.10.

38. Dr. Spiehs stated "Yeah, I just said I'd like to make this a proclamation, please, Nazi. Thank you." ECF 1 p.10.

39. Defendant Shipley stated "Are you ready to be removed?"  Dr. Spiehs stated "I'm making it clear to you that I would like, can you stop my time?" ECF 1 p.10.

40. Defendant Shipley told Dr. Spiehs she would not stop the running of his time because "so far you haven't said anything that has anything to do with this body." ECF 1 p.10.

41. Dr. Spiehs told Shipley "I answered your question.  I'd like to make this a proclamation that the city consider how asinine the Democrats are so thank you. And so the NASDAQ is down 10,829 points. Grocery prices were at 7% today it's at 13.5% The electricity rose 1.5% today it's at 15.8%. The real average hourly earnings increased 4% last day Trump was in office, today its…." ECF 1 p.11.

42. Defendant Shipley interrupted Dr. Spiehs stating "we have no control over the NASDAQ, Mr. Spiehs. Its kind of you to come today sir, but if you don't have anything in the last 2 minutes." ECF 1 p.11.

43. Dr. Spiehs stated "the reason why I bring this up is because I stand on the corner and I campaign and one of my signs says that Democrat Patrick Kelly raised your property taxes and that I never will." ECF 1 p.11.

44. Defendant Shipley interrupted Dr. Spiehs saying "this is a non-partisan body whether anyone is a Democrat or Republican is not relevant." ECF 1 p.11.

45. Dr. Spiehs said "can you stop Nazi?" to which defendant Shipley said "no sir." ECF 1 p.11

46. Dr. Spiehs stated "I'm trying to make my general public comment. I'd like to make it a proclamation. I'd like to make it a proclamation" to which defendant Shipley stated "our time is the city's time." ECF 1 p.11.

47. Defendant Shipley said "you must speak on items germane to this body" which Dr. Spiehs said "I just did Courtney." Defendant Shipley said "no you have not." ECF 1 p.11.

48. Defendant Shipley said "rent and gas have nothing to do with the city of Lawrence" to which Dr. Spiehs said "you guys can do whatever you want with a gas pipeline that doesn't go through here and then when I'm bringing up something that effects people's taxes." ECF 1 p.11.

49. Defendant Shipley said "I welcome you to leave this room sir" to which Dr. Spiehs said "what's that?" Defendant Shipley said "you've been warned" which Dr. Spiehs said "alright, let's do it then. Why are you shutting me down? I want to make this a proclamation on how asinine you guys are. Let's go, let's make this a proclamation. So anyway what I was saying." ECF 1 p.12.

50. Defendant Shipley stated "thank you for leaving, sir. Excuse me sir you're finished" to which Dr. Spiehs said "the reason why I'm bringing this up is because Patrick Kelly had 55 million that he could have dipped into to decrease your property taxes." ECF 1 p.12.

51. Defendant Shipley said "this body is paused until you leave sir" to which Dr. Spiehs said "for what?" Shipley said "we have rules. I've made them clear to you." ECF 1 p.12.

52. Dr. Spiehs said "what are the rules? What are the rules Nazi? What are the rules Nazi?" to which defendant Shipley said "there's nothing germane that you've said so far." ECF 1 p.12.

53. Dr. Spiehs stated "I want a proclamation and its germane to you guys" to which defendant Shipley stated "thank you for coming. You're welcome to leave" to which Dr. Spiehs said "nope, its germane to ..that I could make this proclamation. Why aren't you doing that?" ECF 1 p.12.

54. Defendant Shipley said "you are welcome to leave" to which Dr. Spiehs said "why is that not important? Why is my idea not important? If I was in here about a gas pipeline that doesn't go through here then it would be OK. Is that what you are saying?" to which Shipley said "it has nothing to do with the business of this body." ECF 1 p.12.

55. Defendant Shipley said "you are welcome to leave, sir" to which Dr. Spiehs said "I don't want to leave. I want to finish speaking. You're clearly, you are the same person that sat up there and said you don't want white people on the boards. You're doing this because I'm a white guy. You're doing this because I'm a white guy." ECF 1 p.13.

56. Defendant Shipley said "good bye, sir" to which Dr. Spiehs said "you are a racist" which defendant Shipley said "good bye, sir." ECF 1 p.13.

57. Upon the instructions of defendant Shipley, a Lawrence City police officer forced Dr. Spiehs to leave the building. ECF 1 p.13.

58. Dr. Spiehs again spoke at the next public meeting on October 18, 2022, and repeated all of the topics Shipley stopped him from talking about in the prior meeting. ECF 1, p.15.

59. Dr. Spiehs spoke on rent, his election campaign, taxes, defendant Shipley's SUV, the County's Mill Levy – topics the Commission has no control over – yet defendant Shipley arbitrarily decided not interrupt or have Mr. Spiehs removed over this speech on that occasion.  ECF 1 p.16.

60. Prior to July 18, 2023, the Commission enacted a mask mandate and the topic of "masks" had been discussed uninterrupted over 400 times by the Commission, its Committees, and public speakers prior to Mr. Spiehs' discussion of that topic that night. ECF 1 p.13.

61. On  July 18, 2023, Dr. Spiehs spoke during the general public comment portion in which defendant Larsen was the presiding Mayor.  At the meeting defendant Larsen was alleged by Dr. Spiehs to have "misgendered" a speaker.  ECF 1 p.16.

62. Dr. Spiehs questioned whether defendant's Larsen's speech could be considered a hate crime under the discrimination act the Commission was considering enacting. ECF 1 p.16.

63. Dr. Spiehs said "talk about, talk about baseless conspiracy theories—men having babies, men having periods. Come on, there ain't a bigger conspiracy theory than that." ECF 1 p.16.

64. Dr. Spiehs stated he started protesting in July 2021 against mask mandates in the Lawrence school district to which the defendant Larsen said "Sir, what's it do with the city?" ECF 1 p.17.

65. Dr. Spiehs stated "I came across an article here the other day. It's from June 26th of 2022. It's from the online journal IPerception. It's called "Mask wearing effects emotion perception". As I read through here I want you to think about this through the lens of what children went through while you all supported masking" to which defendant Larsen said "Sir, I'm going to, you are not speaking about something that is germane to the city." ECF 1 p.17.

66. Dr. Spiehs said "you all put in a mask mandate that affected children as far as I am concerned" to which defendant Larsen said "Sir, you're done.  This is your warning" to which Dr. Spiehs said "for what?" ECF 1 p.17.

67. Defendant Larsen said "this is your warning" to which Dr. Spiehs again said "for what?" ECF 1 p.17.

68. Defendant Larsen said "you are not talking about items that are germane to the city commission" to which Dr. Spiehs said "horseshit I'm not" to which Larsen said "and you are done." ECF 1 p.17.

69. Dr. Spiehs said "you are kidding.  You've got to be kidding me. You all put in a mask mandate" to which defendant Larsen said "officer, please remove this .. we'll step back for 5 minutes" to which Dr. Spiehs said "for what. For what. For what?" ECF 1 p.17.

70. Upon the instruction of defendant Larsen, the Lawerence police officer forced Dr. Spiehs to be ejected from the meeting and the building. ECF 1 p.17.

71. Larsen told Dr. Spiehs it was not germane to the City. Dr. Spiehs attempted to finish speaking about mask mandates but Larsen said "Sir, you're done." When Dr. Spiehs questioned why he was being interrupted, Larsen paused the meeting and told Lawrence City police to remove Dr. Spiehs from the meeting and from building. ECF 1 p.17.

## ARGUMENT

### STANDARD

The Court is familiar with the summary judgment standard. The Court views all evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party. *See Werner v. McGonigale*, No. 22-cv-02329, 2024 WL 216836 at *1 (D. Kan. January 19, 2024.

### PRETRIAL ORDER

Plaintiff brings 1983 claims on Counts 1, 2, & 4 First Amendment and Equal protection claims against all defendants. ECF 81, p.7. Plaintiff brings a 1983 First Amendment retaliation claim in Count 3 as to all defendants.

### RETALIATION

A First Amendment retaliation claim outside the employment context are: (a) he or she was engaged in constitutionally protected activity; (b) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (c) the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of

constitutionally protected conduct. *Van Deelen v. Johnson*, 497 F.3d 1151, 1155-56 (10th Cir. 2007).   Dr. Spiehs is a citizen journalist publishing stories and his observations and opinions.[1]  He has engaged in protected activities as a citizen and as a journalist prior to the adverse actions of defendants Shipley and Larsen.  Dr. Spiehs has a clearly established right to publish on a topic of public interest as well as speak to policy inconsistencies, or even unethical or illegal practices of these defendants.

### LARSEN JULY 18, 2023

There are three retaliatory actions Larsen engaged in: (1) stopping Dr. Spiehs speech before his time expired; (2) having law enforcement remove him from not only the meeting room but the City building; and (3) preventing Dr. Spiehs from participating in the same night second public comment session.  It is not a crime to violate a purported Commission speech restriction during a meeting yet Larsen employed police to enforce her retaliatory actions.  In baseball vernacular, there could be no "strikes" to call against the speaker as there was no topic limitation at all. Then, Larsen's function as an umpire to call the balls and strikes (what comes in and what stays out) is one thing but then to call "strikes" on things that were balls (legitimate topics) then force the batter (Dr. Spiehs) to not only leave the plate, not return to his dugout to participate in the rest of the game, but be ejected from the

---

[1] *See Berge v. School Committee of Gloucester, 1*07 F. 4th 33, fn.2 (1st Cir. 2024)("a citizen-journalist is like an unpaid freelancer who uses digital media to report on newsworthy events"); *Bustillos v. City of Artesia*, 591 F. Supp. 3d 1051, 1064 (D.N.M. Mar. 17, 2022) ("News-gathering protections of the First Amendment do not turn on professional credentials or status").

stadium where he could not return to bat was punitive and retaliatory. Dr. Spiehs alleged constitutional protected activity of criticizing defendant Larsen prior to her adverse action of silencing Dr. Spiehs and then having him ejected from the building. Dr. Spiehs' protected speech also including his misgendering critique of Larsen which can be seen as embarrassing (Larsen saying "I do apologize").  Under Lawrence's own policies, misgendering is a matter of public concern.  That, in addition to the prior criticisms, connects Larsen to the constant interrupting confrontation, her ignoring that the City had enacted a mask mandate that Dr. Spiehs was referring to, as well as interpreting the policy arbitrarily (ignoring the language of "should" and not "must") as well as interpreting "business" to not include the topics Dr. Spiehs was addressing.  Dr. Spiehs uttered no threats or anything that concerned the safety of individuals in that room.  Requiring Dr. Spiehs to leave the building under police force was punitive.  The fact that after revoking Dr. Spiehs remaining time, rather than permit him to return to his seat Larsen then used police to intimidate and force Dr. Spiehs to be marched out of the room and the building for this purported off-topic violation.  Any one of those discreet actions, or taken together as a cumulative effect, would *objectively* chill a reasonable person's speech. The additional part of the retaliation was preventing Dr. Spiehs from participating in that meetings second public comments section.  There were two sections – Dr. Spiehs got ejected in which denied him the following opportunity to participate in that meeting's second public speaking session.

Barring Dr. Spiehs from attending or addressing the Commission at the later Public Comment section that evening is functionally a prior restraint, which is presumptively unconstitutional. *Neb. Press Assoc. v. Stuart*, 427 U.S. 539, 592 (1976). The "punitive machinery of government" was doubly used to impose "concrete consequences" in retaliation against Dr. Spiehs. *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003). The jury can evaluate why defendant Larsen permitted the numerous speakers to speak on matter over which the Commission had no control yet without interruption, while selecting Dr. Spiehs for her harsh treatment. Dr. Spiehs injuries are compensable in damages.

SHIPLEY OCTOBER 2022

On September 6, 2022, then mayor Shipley made her comments about not appointing white board members – simply because they were white. Dr. Spiehs confronted and criticized Shipley at the meeting and then posted his YouTube video publishing the same racism accusation. The October 18, 2022, meeting was the first or second meeting with the new speech requirements motivated primarily by Dr. Spiehs' prior attendance. Dr. Spiehs had been a constant critic at meetings which led the Commission to enact its germane-business policy. Shipley was criticized by Dr. Spiehs for Shipley's goal that "we do not appoint frankly all white boards which is something we have rather a lot of" in a September 6, 2022, City meeting. Dr. Spiehs criticized Shipley calling her a racist and published a YouTube video. All of these activities were protected speech about matters of public concern. Putting aside the fact Shipley terminated Dr. Spiehs speaking time, there was no reason to eject him – just let him return to his seat awaiting the next speaking session. Shipley's ejection

16

was doubly retaliatory as punishing him twice in not being able to be in attendance or in speaking at the following speaking session. "Motivation is a question of fact." *Cillo v. City of Greenwood Village,* 739 F.3d 451, 463 (10th Cir. 2013). "Whether a defendant acted with a retaliatory animus is typically a fact question left to the jury." *Cousik v. City & Cnty. of Denver*, No. 22-cv-01213-NYW-KAS, 2024 WL 896755, at *4 (D. Colo. Mar. 1, 2024). A jury can also determine Shipley's actions were retaliatory because the very next meeting Dr. Spiehs spoke an essentially the same topics without being stopped or ejected. A jury can reasonably determine that Shipley's combined actions of stopping Dr. Spiehs' speech before his time expired, then using police to march Dr. Spiehs out of the building – rather than letting him return to his seat – was retaliatory – particularly when Shipley heard the same speech topics at the next meeting without consequence.

### RETALIATION POLICY AND POLICY MAKER

The City made each presiding mayor into their own on-the-spot policymaker each to decide what the actual policy would be for that particular open meeting session. These defendants improperly use police to intimidate and enforce their open meeting rules – a purported violation of which is not crime. This use of police is retaliatory. Defendants use a "LEO" to bully, intimidate, and then as their personal private security force in converting their speech policy violations into crimes. These "local officials have a history of targeting" Dr. Spiehs. *Villarreal v. City of Laredo*, 44 F.4th 363, 371 (5th Cir. 2022). These defendants have weaponized its open meetings engineering policy violations as a crime using the Lawrence police department:

17

It is the unfortunate reality of modern American life that more and more citizens are increasingly unable or unwilling to live amicably with those we disagree with. Rather than debate, we would destroy. Instead of engaging opponents in the political arena, we expel them from economic and social life, using every resource available to us. "Our society ... once embraced the quintessentially American maxim: 'I disapprove of what you say, but I will defend to the death your right to say it.' But our culture ... increasingly send[s] citizens ... the opposite message: I disapprove of what you say, and I will use every means at my disposal to stop you from saying it."In these already troubling times, this is an exceedingly troubling case. It's bad enough when private citizens mistreat others because of their political views. It's beyond the pale when law enforcement officials weaponize the justice system to punish their political opponents. One is terrible. But the other is totalitarian.

*Villarreal at* 378-82 (Ho, J., concurring).

The City of Lawrence is governed by its Commissioners who have caused – the moving force – regarding a violation of a federal right by: (1) directing that the violation occur; (2) authorizing the violation; (3) agreeing to a subordinate's decision to engage in the violation; or through acquiescence or ratification of either defendant Larsen or Shipley's actions. *Bryson v. City of Okla. City,* 627 F.3d 784, 788 (10th Cir. 2010). This *laisse faire* policy is known by the City to be interpreted differently and enforced differently – particularly when there are no objective workable standards – a workable definition – of what constitutes the City's "business" as well as "should" versus "must." Despite these well known arbitrary outcomes, the City is content on not fixing those problems. Thus why the topics spoken at these meetings are all over the map depending on who is the presiding mayor. These varying topic outcomes with different outcomes upon the speakers is an endemic problem traceable to the policy itself. It is systemic. When systemic, "municipal liability may exist without

18

individual liability." *Lucas v. Turn Key Health Clinics, LLC,* 58 F.4th 1127, 1144 (10th Cir. 2023).

### CITY'S POLICY HAS NO WORKABLE STANDARDS AND ARE KNOWN TO BE INTERPRETED DIFFERENTLY VIOLATING FIRST AMENDMENT AND EQUAL PROTECTION

It "is always in the public interest to prevent the violation of a party's constitutional rights." *Pryor v. Sch. Dist. No. 1,* 99 F.4th 1243, 1254 (10th Cir. 2024). The paradox the Court is presented with is a policy that actually does not require a topic restriction for its general comment section and then has no workable objective standards. *See Minn. Voters All. v. Mansky,* 585 U.S. 1, 11–12 (2018). The facts show that defendant Shipley used ambiguous suggestive language ("invite to you leave") and "you're welcome to leave") which in *post hac* fashion she now claims these were commands and not suggestions. The use of the word "should" rather than "shall" in the public speaking section is another suggestion that defendants assert is a command rather than a suggestion. Even restrictions that pursue legitimate objectives can be unlawful if their enforcement cannot be "guided by objective, workable standards." *Id.* at 21. And this policy is precisely the "unguided" kind. The Court need not take the plaintiff's word – the defendants freely admit this in their testimony. The purpose of requiring "objective" standards is to prevent the very thing that occurred – the meaning of the policy changes with each new presiding mayor. Defendant Larsen admitted the interpretation of the policy was subjective – and actually defendant Shipley did not disagree in practicality when she testified she interpreted the policy – as specifically applied to Dr. Spiehs – differently than her counterpart mayor Larsen.

### SHOULD IS A SUGGESTION AND NOT A REQUIREMENT

Another wild card for each presiding mayor arises. The Resolution does not actually *require* a topic to be "germane" to the City's "business" because it utilizes the word "should" rather than "shall" – that is if the plain meaning of "should" is used. The Resolution language states:

> General Public Comment should be limited to issues and items germane to the business of the Governing Body.

The *Moms'* panel in *Moms for Liberty v. Brevard Pub. Sch.,* 118 F.4th 1324 (11th Cir. 2024) first resorted to dictionaries. *Id.* at 1333. The City is the master of its own rules and are bound to them. The City "must respect the lawful boundaries it has itself set." *Rosenberger v. Rector & Visitors of the Univ. of Va.,* 515 U.S. 819, 829 (1995). This City is subject to its own language as it imposed in creating it. The Resolution never uses the clear word "must" for any speaking section. *See Indigo Ag, Inc. v. Summit Ag, LLC*, 2023 WL 3884697 at *5 (June 8, 2023) (use of word "must" is mandatory). The resolution uses both words "shall" and "should" for different speaking forum sections. As another court in this district ruled, "in the court's view, the word 'should' does not mean 'shall.'" *Frobish v. US Army*, 766 F.Supp. 919, 927 (D.Kan. 1991). The word "should" "is advisory, not compulsory." *Henderson v. Montgomery Cty. Bd. of Commissioners*, 57 Kan. App. 2d 818, 461 P.3d 64, 76, *rev. denied* 312 Kan. 891 (2020). Even the term "shall" is ambiguous. *See State v. Raschke*, 289 Kan. 911, 920-22, 219 P.3d 481 (2009) (recognizing "shall" can be either mandatory or directory depending on context). The defendant mayors are misinterpreting the General speaking resolution language.

**LARSEN'S AND SHIPLEY'S DEFINITIONS OF "BUSINESS" IS USELESS AND
DELIBERATELY VAGUE**

Even when specifically compelled through discovery to answer the question of what "business" means both gave evasive and useless definitions: consider Shipley's "Business of the Governing Body" refers to the City of Lawrence's business." Defining "business" using the same word "business" makes the listener dumber. It explains nothing as to what "business" actually means – and this by design. Larsen fairs little better: "Business of the Governing Body" means those issues for which the City had purview over." If purview means the range or limit of City authority – the City has "purview" to make proclamations, suggest topics be germane to the City's business, as well as have citizens talk about proclamation subjects. Each mayor has purview to allow speakers to talk about things the Commission has no legislative authority. One can see why each presiding mayor's free wheeling license to interpret "business" differently leads to arbitrary interpretation and enforcement outcomes.

**LARSEN'S AND SHIPLEY'S DEFINITION OF "BUSINESS" WILL PRODUCE DIFFERENT
OUTCOMES IS VAGUE AND VIOLATES EQUAL PROTECTION**

Defendants' *post hoc* reasoning asserting a new reason – disruption – demonstrates both definitions they each provided as to "disruption" as not being objective or any workable standard. Shipley defined "Disruptive speech" as "speech that is timed or designed to interfere for example with a City of Lawrence meeting." "Timed or designed" infers a speaker's motive and intent. And Shipley's definition encompasses protected speech – she does not limit disruptive speech to fighting words or any other non-protected speech category. And Shipley doesn't even limit it to a meeting – that is but one example. Shipley says any protected speech timed or

designed "to interfere" literally *with anything* is enough to cause her to punish the speech.  Larsen's definition is completely different: she says "Disruptive Speech" "is speech that prevents a meeting from continuing in a normal manner."  There is no intent or motive involved in Larsen's definition.  And how does a speaker's protected speech, even if its is off-topic, during his allotted 3 minute time prevent a meeting from continuing in a normal manner?   The meeting continues as scheduled for the allotted three minutes.  If "prevents" and "normal manner" equate to simply talking off-topic during the allotted three minutes, this is not remotely an objective or reasonable standard.   The idea that two presiding mayors can provide different definitions of the Resolution language – both of which are apparently the arbitrary (and unpublished) "strike zone" each presiding mayor carries with her at each meeting – demonstrates there are no "objective" standards for the public comment sections. And because Dr. Spiehs cannot propound interrogatory 21 to every following presiding mayor that leaves him guessing as to how the new presiding mayor interprets – or will enforce – the verbiage in the public comment sections.  And one more point: it is not as though the Commission is not aware of this.  It is systemic. The City purposely does not define for the presiding mayors any objective standard at all and permits if not encourages each presiding mayor to go rogue in conjuring up her own different and unique, if not altogether conflicting, definitions of these substantive speech rules.  This is a "track record of this policy's enforcement" which "mirrors [Shipley's and Larsen's] muddled definition." *Moms for Liberty* at 1336.  The *Moms* panel examined a similar inconsistent track record of the terms of speaking

policy and concluded "these examples illustrate, enforcement of this policy was as inconsistent as the definitions offered to support it." *Id.* at 1337. Using Larsen's and Shipley's definitions does not articulate any "sensible basis for distinguishing what may come in from what must stay out." *Id.* (quoting *Mansky* at 16)). This policy and its haphazard enforcement cannot pass strict scrutiny.

## AN INVITATION TO LEAVE IS NOT A COMMAND

Defendant Shipley repeatedly framed her dialogue with Dr. Spiehs as suggestions and not commands – "I welcome you to leave" and "You're welcome to leave." Dr. Spiehs is not a mind reader as to whether Shipley is being true to her language or is being passive / aggressive. Dr. Spiehs understood those statements as suggestions and said he would choose to stay rather than take Shipley up on her suggestions. Shipley then subsequently treated those suggestions as commands and because Dr. Spiehs did not accept the invitations they were transformed into commands – and then a "disruption." The statements of Shipley were suggestions and reasonably appeared so during that meeting. Dr. Spiehs should not be faulted for understanding her statements in that fashion. The interpretation is a factual question.

## DR SPIEHS NEVER VIOLATED THE TOPIC RESTRICTION OF "BUSINESS"

Even if the Court interprets "should" as "must" Dr. Spiehs' speech was well within the contours of the City's "business" nomenclature. What the Commission touts as a speaking guideline policy is actually no restriction at all concerning topics. The Commission has enacted a rule that places speech between the playing field goal posts of what it calls the "business" of the Board. "Business" is not defined by the

Commission but is commonly understood as an "immediate task," a "particular field of endeavor," or an "affair" or "matter."   Webster's Third New International Dictionary 302 (1981).  In this case because the City's "*business*" is endorsing an unlimited range of topics through its proclamation process – and allowing the public to not only comment upon but make suggestions to it about those topics – its "business" playing field is unlimited.  The *business* limitation is actually no speech topic limitation at all under this analysis.  The facts show that the *business* of this Board is to allow the public to suggest to it a limitless boundary of topics that the Commission issue a proclamation position on.  The Commission then issues what it calls "proclamations" which many times are position-papers seeking to influence on matters over which the City has no legislative authority at all.  The City routinely places proclamations in its public meeting agendas it seeks to endorse regarding a host of topics it does not have any legislative control through its ordinances.   A proclamation is government speech. *Bloomberg v. Blocker,* 586 F.Supp.3d 1251, 1257 (M.D. Fla. Feb. 17, 2022).  A proclamation is a formal ceremonial order: the "usual purpose of a proclamation is to declare some special day or week in honor of or in commemoration of some special thing or event. It is issued to make the public aware of the commemoration and usually has no legal effect." *Shapp v. Butera,* 22 Pa. Cmwlth. 229, 234, 348 A.2d 910 (1975).  These mayors utilize the open meeting process to both solicit ideas for proclamations as well as hearing pros and cons to proposed proclamations.

**DEFENDANTS ADMIT BY WORDS AND ACTIONS THAT THE MEANING OF BUSINESS IS VAGUE AND SUBJECT TO ARBITRARY INTERPRETATION AND ENFORCEMENT**

Assuming "business" is construed by a mayor as any activity of this Commission, that is a factual issue unique to each presiding mayor. There is no objective topic identified.  Rather, each presiding Mayor, each member of the public – and now this Court – must then engage in a factual and wholistic historical analysis of what activities the Commission engages in for whatever applicable time period. Both Larsen and Shipley admit defining City "business" is an "open-ended" interpretation. Any "indeterminate prohibition carries with it the opportunity for abuse," particularly when that prohibition "has received a virtually open-ended interpretation." *Id.*  Under *Mansky* the City's policy is unreasonable because it "fails to define key terms, lacks any official guidance, and vests too much discretion in those charged with its application."  *Young Israel of Tampa, Inc. v. Hillsborough Area Reg'l Transit Auth.,* 89 F.4th 1337, 1347 (11th Cir. 2024).  At the very least, the City "must be able to articulate some sensible basis for distinguishing what may come in from what must stay out," which arbitrarily depends on which particular Mayor is running the meeting. *See Mansky,* 585 U.S. at 16.  A "grant of unrestrained discretion to an official responsible for monitoring and regulating First Amendment activities is facially unconstitutional." *Atlanta J. & Const. v. City of Atlanta Dep't of Aviation,* 322 F.3d 1298, 1310 (11th Cir. 2003).  The government, in short, must avoid enforcement that is "haphazard and arbitrary." *Cambridge Christian Sch.,* 942 F.3d at 1243.

### THE FORUM IS A TRADITIONAL PUBLIC FORUM REQUIRING STRICT SCRUTINY NARROWLY TAILORED

The "Supreme Court has sorted government property into the following categories: traditional public forums, designated public forums, limited public forums, and nonpublic forums." *Pollak v. Wilson,* No. 22-8017, 2022 WL 17958787, at *1 (10th Cir. Dec.27, 2022) (unpublished); *see Verlo v. Martinez,* 820 F.3d 1113, 1144, 2016 WL 1395205, at *24 (10th Cir. Apr. 8, 2016) ("forum status is an inherently factual inquiry about the government's intent and the surrounding circumstances that requires the district court to make detailed factual findings").

The speaker forum operated by the Commission is a public forum by designation for  two  reasons: **(1) <u>First</u>**, it enacted a rule limiting comment topics connected to its "business."  Thus the subject matter of its "business" yet it is the business of this Board to hear public comment on, and then to endorse, a limitless range of topics over which the Board has no legislative control.  It utilizes these proclamations as a way to officially endorse or otherwise influence public opinion. The speech topics connected to its "business" are limitless which means this rule imposes no topic limitations whatsoever; and **(2)** the **<u>second</u>** reason is that "business" is limited to topics the Commission can lawfully enact ordinances effecting legal rights, in practicality each presiding mayor does not meaningfully enforce that particular definition or utilize any objective or workable definition of how "business" is defined.  *Mansky* at 11–12.  Rather, the public speaking sessions are functionally a "laissez-faire" type public comment section based upon each Mayor's *ad hoc* views. *See Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 44 (1983);

*Forsyth Cnty. v. Nationalist Movement,* 505 U.S. 123, 130 (1992) ("A government regulation that allows arbitrary application is 'inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view'"). Defendants cannot meet the "heavy burden" of strict scrutiny in justifying its actions targeting Dr. Spiehs' speech and his subsequent ejection from each of the public speaking sections of each meeting.

### POST HAC REASONING

There is no question that speaker-based discrimination occurred. Of all the speakers purportedly violating the connection-to-the-business rule, the axe fell upon Dr. Spiehs. Speaker-based discrimination must pass strict scrutiny review. The City's policy also contained these restrictions: "fighting words, slander, speeches invasive of the privacy of individuals, unreasonably loud or repetitious speech," and "speech so disruptive of the proceedings that it substantially interferes with the Governing Body's ability to conduct the business of the City." But none of the defendant mayors actually articulated any of those restrictions as justifying either silencing Dr. Spiehs or having him removed. Rather, each mayor only asserted Dr. Spiehs was speaking off topic. Post hac reasoning does not pass strict scrutiny.

What the mayors could-have-should-have reasoned is irrelevant. "Government justifications for interfering with First Amendment rights must be genuine, not hypothesized or invented *post hoc* in response to litigation." *Kennedy v. Bremerton Sch. Dist.,* 597 U.S. 507, 543 n.8 (2022). Justification for such interference must also be communicated to the affected person. *See id.* ("But [defendant] never raised

concerns along these lines in its contemporaneous correspondence with [plaintiff]"). A court may not favorably impute motives or reasons to the defendants.

And the narrowly tailored solution to this purported off-topic speaking is not to eject the speaker but instead have the speaker return to his seat.  But that narrowly tailored option was never offered to Dr. Spiehs.  Similarly, it was not narrowly tailored to stop Dr. Spiehs from listening or returning for the second public speaking section.  The First Amendment also protects Dr. Spiehs right to simply listen and observe the meeting. "The First Amendment protects the right to hear as well as to speak," so that which "silences a willing speaker…also works a constitutional injury against the hearer." *Basiardanes v. City of Galveston*, 682 F.2d 1203, 1211 (5th Cir. 1982).  The defendants cannot survive strict scrutiny.

**DR. SPIEHS PURPORTEDLY SPEAKING OFF-TOPIC IS NOT A DISRUPTION BECAUSE HE DID NOT USE FIGHTING WORDS OR INCITE VIOLENCE**

As to the new after the fact reason that off-topic speech during the speaker's allotted time somehow substantially disrupts the meeting that also does not pass strict scrutiny. The actual verbiage states "speech so disruptive of the proceedings that it substantially interferes with the Governing Body's ability to conduct the business of the City."  Dr. Spiehs was speaking during his allotted time.  That was the business of the Board to give three minutes of speaking time to Dr. Spiehs. He wasn't extending the meeting nor was he taking time away from other speakers as the mayor Shipley would not extend his time.   Purportedly speaking off topic during Dr. Spiehs' allotted speaking time was not alleged to been fighting words or inciting violence – it was protected speech.  Nothing Dr. Spiehs said ever created an unsafe

28

situation. This category of "disruptive speech" is unconstitutionally vague and overbroad. The Resolution language equates offensive (disruptive) speech with disruptive behavior. "Government cannot regulate speech by relabeling it as conduct." *Otto v. City of Boca Raton*, 981 F.3d 854, 865 (11th Cir. 2020) (citing *Texas v. Johnson*, 491 U.S. 397, 414 (1989)). The fact that a presiding mayor misunderstood Dr. Spiehs and then decided to interrupt and question Dr. Spiehs during his public comment time is not a disruption caused by Dr. Spiehs. Such a post hac rationalization reduces disagreeing with the presiding mayor's interpretation of the speech to a "substantial disruption." As Larsen and Shipley both admit, the boundaries of what constitutes City Business is "unsettled" and Dr. Spiehs is not at fault for that. *See Moms for Liberty at* 1337 ("because of the unsettled boundaries of the policy"). It is not a disruption, much less a "substantial" disruption of anything contained in the Agenda for each of those meetings as Dr. Spiehs was using his allotted time utilizing protected speech.

### CREDIBILITY IS FOR THE JURY

Putting aside that Dr. Spiehs' speech at all times was well within the "business" playing field of the speech rules, Dr. Spiehs specifically invoked asking for a proclamation. While it may be considered disingenuous by a skeptical eye, that Dr. Spiehs was not seriously proposing a proclamation, free speech rights in this non-employer context do not depend upon the speaker's motives. *Worrell v. Henry,* 219 F.3d 1197 (10th Cir.2000).[2]   Besides, even if a speaker's motives were at issue in a

---

[2] Listing three elements for retaliatory conduct which do not include analyzing a plaintiff's motives.

First Amendment claim, the Court cannot weigh Dr. Spiehs' motives. Rather, a "state, or a court, may not constitutionally substitute its own judgment for that of the plaintiff on what would burden its expression." *Democratic Party of U.S. v. Wisconsin,* 450 U.S. 107, 123-24 (1981). Rather, the court must "give deference to [the] association's view of what would impair its expression." *Boy Scouts of Am. v. Dale,* 530 U.S. 640, 653 (2000). Similarly, Dr. Spiehs definitely invoked "proclamation" numerous times as recorded on the video. Whether defendant Shipley's assertion that she didn't hear the proclamation invocation by Dr. Spiehs begs the question: it sounds like it would have made all the difference to Shipley. All of this is another credibility determination for the jury. Defendant Larsen testified that she misunderstood what mask mandate Dr. Spiehs was referring to. Another credibility determination. Any additional unarticulated post hac reasons Larsen gave after the fact create another factual pretext issue for the jury to believe or disbelieve. Credibility determinations are not subject to summary judgment determination. *Forth v. Laramie Cnty. Sch. Dist. No. 1,* 85 F.4th 1044, 1052 (10th Cir. 2023) (a court "should not weigh the evidence, make credibility determinations, or assess the credibility of conflicting testimony at the summary judgment stage").

### DOES NOT PASS THE REASONABLENESS TEST

The reasonableness test asks in part whether a restriction on speech is enforced in an arbitrary or haphazard way. *Minn. Voters All.,* 138 S. Ct. at 1888. Here, each mayor did not merely revoke Dr. Spiehs' remaining speaking time, they each did much more. Not only could Dr. Spiehs not go back to his seat to listen and wait for the next speaking session, each used police to make Dr. Spiehs to leave the

meeting room – and then out of the building.   However each mayor arbitrarily interprets "business" the meetings themselves demonstrate there are no speech limitations because of the varying interpretations made by the presiding mayors. "Asking if the Board's approach to this policy was 'haphazard' is like asking if the sky is blue – enforcement was so inconsistent that it is impossible to discern the standard used to assess which speech was permitted at any given meeting." *Moms for Liberty at* 1335.

Even if the defendants conjure up a different meaning of "business" ignoring its business of making proclamations, whatever that definition might be the Commission still operates a laissez-faire standardless public speaking policy. The erratic and standardless application undermines any claim it is a limited public forum. *See Planned Parenthood Ass'n/Chi. Area v. Chi. Transit Auth.,* 767 F.2d 1225, 1232 (7th Cir. 1985) (inconsistent and loose application of policy was "laissez-faire" and created designated public forum); *See also Gregoire v. Centennial Sch. Dist.,* 907 F.2d 1366, 1374 (3d Cir. 1990) ("access to many diverse groups" evinced intent to create designated public forum); *United Food & Com. Workers Union, Loc. 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 355 (6th Cir. 1998) ("In accepting a wide array of political and public-issue speech, SORTA has demonstrated its intent to designate … a public forum"). "Having effectively opened its doors to all comers, subject only a standardless standard," the City defendants have "failed to exercise the clear and consistent control" over the scope of speech "required to maintain a [limited] public forum." *Hopper v. City of Pasco*, 241 F.3d 1067, 1080 (9th Cir. 2001).

The City operates a public forum subject to strict scrutiny. It is a designated public forum. *See Mesa v. White*, 197 F.3d 1041, 1045 (10th Cir. 1999).

The respective mayor's "inconsistent enforcement is exactly what the Supreme Court have warned against." *Moms for Liberty* at 1336. "Permitting certain speech on some days and not on others without any credible explanation of what may have changed is the essence of arbitrary, capricious, and haphazard – and therefore unreasonable –decision-making." *Id.* (cleaned up).

### DENIAL OF BENEFIT EQUAL PROTECTION

Dr. Spiehs was denied the "equal share of the rights, benefits, and privileges enjoyed by other citizens" who spoke at public meetings as a class of one. Defendants treated Dr. Spiehs differently than others who were similarly situated in every material respect. *Kansas Penn Gaming, LLC v. Collins,* 656 F.3d 1210, 1216 (10th Cir. 2011). Dr. Spiehs has identified *by name* each of these speakers at each meeting on dates certain who were similarly situated in his sworn statement. Nearly 95% of all of the identified speakers spoke "off-topic" over a span of nearly two years without retributive repercussions.

### STRICT SCRUTINY

A "designated public forum is treated the same as a traditional public forum when assessing the government's ability to restrict speech." *Sessler v. City of Davenport*, 102 F.4th 876, 882 (8th Cir. 2024); *Pleasant Grove City v. Summum,* 555 U.S. 460, 469 (2009) ("subject to the same strict scrutiny as restrictions in a traditional public forum"). To satisfy strict scrutiny, defendants must first "specifically identify an actual problem in need of solving." *Brown v. Ent. Merchants*

*Ass'n,* 564 U.S. 786, 799 (2011). What was the problem with Dr. Spiehs talking about masks or suggesting a proclamation that the Commission's prior masking policy was "asinine?" Dr. Spiehs invoked the proclamation topic which the defendant mayor ignored. Suggesting a topic for a proclamation is legitimate business of this Board. Silencing Dr. Spiehs and then having him removed using police from the building does not even pass the reasonableness test. Prohibiting Dr. Spiehs to speak on the same plethora of topics all other speakers are allowed to speak upon does not even pass the rational basis test. Defendants cannot show that stopping Dr. Spiehs speech and his removal was necessary to serve a compelling state interest.

Dr. Spiehs was always talking about permissible content – masks had repeatedly been an oft topic and subject of the Commission's actions. But Dr. Spiehs was entirely and always talking about the business of the board. Dr. Spiehs said he wanted his topic to be a proclamation. Then, not only telling Dr. Spiehs to stop talking because of the subject matter – and before his time expired – each then required him, as a result of that purported topic violation, to leave the building -- rather than the option of simply returning to his seat. Thus the defendants face a "narrowly tailored" and "significant government interest" hurdles that they cannot meet.

The defendants application of its policy is similar to the "political" prohibition in Minnesota Voters Alliance in which it stated "political" was so broadly encompassing, together with the "unmoored use of the term 'political' in the Minnesota law, combined with the haphazard interpretations of the State" failed the

strict scrutiny test.  The defendants readily admit  that they do – and are free to – interpret the "business" restriction different with different outcomes.  That is a textbook definition of "arbitrary."   It is "self evident" that the "indeterminate prohibition carries with it the opportunity for abuse, especially where it has received a virtually open-ended interpretation." *Id.* at 1881 (quoting *Jews for Jesus*, 482 U.S., at 576, 107 S.Ct. 2568).  The Mayors have no workable standards at all for how to interpret "business" as evidenced in the unpredictable ways each enforce – or interpret – or don't enforce – the meaning of business.  Pick the topic over which the Commission has zero control – *Palestine*, *et al* – the list has no imagined boundaries.

Without "objective, workable standards" the "Mayors] own politics may shape his views on what counts as ["business."]  And if [speakers] experience or witness episodes of unfair or inconsistent enforcement of the ban, the [Commission's] interest in maintaining a [meeting] place free of distraction and disruption would be undermined by the very measure intended to further it." *Id.* at 1881.

First, the policy speaks of "disruptive" speech – not behavior.  Yet speech is treated as conduct each time Dr. Spiehs purportedly spoke off-topic he was removed – thus meaning it was "disruptive behavior."  Second, speakers under the General Public Comment Resolution, are allowed to "speak on items not scheduled for discussion on any agenda prepared for that meeting."  While the Specific Comment portion is limited with the language "***shall*** be germane" the General Comment portion is not so limited.  It states the "General Public Comment ***should*** be limited to issues and items germane to the business of the Governing Body."  Is "germane to

34

the business of the Governing Body" mandatory or permissive? The phrase "should be germane to the business of the Governing body" is unconstitutionally vague as a speaker cannot discern what exactly constitutes the "business" of the board at each meeting. Mayor Larsen admits it is not a "clear guideline" not only verbally but also in the way this phrase is interpreted. Third, the words and phrases "slander, speech invasive of the privacy of individuals, unreasonably loud or repetitious speech" are unworkable, unreasonable, and overbroad and unconstitutionally vague. To enforce "slander" the presiding mayor must be judge, jury, and executioner as to what constitutes every element of defamation. PIK 127.51. To be "invasive of privacy" means what? So one can be loud – but not *unreasonably* loud? The Mayor does not give a speaker an ongoing decibel meter that flashes red when the volume crosses this *unreasonable* line. That subjects a speaker to arbitrary enforcement. How does a speaker determine "repetitious"? Like repeating someone's name or a topic or repeating another speaker's topics or phrases? Can a speaker make the same point different ways?

The defendants have not drawn "a reasonable line" when regulating the content of speech at its open meetings. *Mansky* at 1888. Defendants bear the burden to "articulate some sensible basis for distinguishing what may come in from what must stay out." *Id.* And its rules must further – rather than undermine – the purpose of the forum. *Id.* at 1891. As one court has explained, an "opinion that a school employee is incompetent in performing school duties or violating the law governing the performance of the employee's duties is in fact relevant to the purpose of the

limited public forum." *Marshall v. Amuso*, 571 F. Supp. 3d 412, 426 (E.D. Pa. 2021). Thus, the manner in which defendants interpret its speaking policy "undermines" defendants' "interest in maintaining" a forum to hear opinions about literally anything a proclamation does or may include, *Mansky* at 1891, because it prevents speakers from discussing issues that otherwise fit within the "subject matter" that the City talks about.

## Conclusion

The Court starts from the premise theses are meetings open to the public. The second inquiry is the purpose of the forum. Call it "judgment calls" or pure interpretation of the Resolution language, that purpose is gleaned not only from the language of the City's Resolution but how, in practice, each presiding mayor interprets that language over what has been a span of two years. And to both questions the language of the Resolution does not limit topics of discussion and this conclusion is supported in the *laisse faire* application of the language allowing all topics as legitimate points of discussion. The public comment section of this City's public meeting is a public forum by designation. Strict scrutiny with narrow tailoring applies to all of its actions. Because of the City's censorship of Dr. Spiehs, including his function as a citizen journalist, not only was his right to speak on these matters interfered with, but the right of untold others to receive information from his speech and attendance also harmed.

The meaning of "business" of this City Commission encompasses every imaginable topic under its proclamation practice. The meaning of its "business" is

also demonstrated in its own documented track record interpreting "business" by allowing public comments over 2023 and 2024 at all of its public meetings, and then without interruption, on literally everything under the sun – from the 305 topics identified in its meetings: Palestinians, the bathrooms at KCI airport, Nuremberg tribunals, the National Guard being federalized, feeling uncomfortable using restrooms at the State Capital, to playing in the KU band to name only a few.  The Court should not lose sight of the "slipperiness" of the Resolution language, the definitional interpretations of Larsen and Shipley, as well as its nearly two-year application of allowing all topics. *See Speech First, Inc. v. Cartwright,* 32 F.4th 1110, 1122 (11th Cir. 2022).  Defining these terms thus makes the constitutional problems even more apparent – which is why Defendants avoid doing so. Yet that only exacerbates the vagueness problem, as Dr. Spiehs is left to wonder from meeting to meeting and presiding officer to presiding officer what definition the presiding officer might employ.

To frame *Mansky's* objective and workable standard, borrowing a baseball umpiring analogy, a regulation and its enforcers are to call balls and strikes with a *consistent* strike zone.  In this case, nothing in the City's Resolution, or in its interpretation and application since its inception, demonstrate any strike zone at all, much less a "consistent" one.   In this City comment policy, there is no strike zone of topics at all.  But pretending there is one, changing presiding mayors, like changing umpires, still means one still must use the same strike zone – which the City's two year history demonstrates precisely the opposite in the Lawrence open meetings.  The

track record of these meetings show there is absolutely no objective or workable "strike zone" as pitches down the middle (Palestine, poop and pee, KU Band, Indigents, Israel, world peace, favorite movies, Roman history) which were consistently not called "strikes" – all apparently depending on the umpire's interpretation that there was no strike zone, or a moving one based upon the umpire's preference for the batter or the topic.   Neither Larsen nor Shipley should have called Constitutional "strikes" on Dr. Spiehs' legitimate topics of speech nor should they have revoked his "batting" (speaking) time, not allowed him to return to the "dugout" (his seat) where he could listen and still participate in the "game" (meeting) but instead ejected him using stadium police from the "stadium" (meeting building) in which Dr. Spiehs could not return for the next speaking benefit in the following "inning" (second public comment session).   All the while the "Commissioner of Baseball) (Commission) looked on in approval.   All of these actions were rank retaliatory and punitive personal actions on the part of all these defendants.

Dr. Spiehs was given three minutes to speak.   Even if he purportedly went off the playing field of the City's business his protected speech did not disrupt the public comment section of the meeting.   The Resolution itself attempts to convert pure protected speech to equal conduct or disruptive conduct which is not permissible. Resolution purports to use speech as a proxy for conduct.   The Court will not find any published case law after *Reed v. Town of Gilbert,* 576 U.S. 155 (2015) in which treats words as conduct and allows the government to regulate it as such.   Courts have "already rejected the practice of relabeling controversial speech as conduct." *Otto at* 861.   There is no such thing as a "manner" restriction that allows the government to

ban speech, without more, on the grounds that the speaker's choice of words is inappropriate. Speaking off-topic does not and did not delay the next speaker as he was ejected even before his time expired. The disruption issue turns on behavior, not speech – yet this is precisely the Resolution equation that is impermissible. It was possible to maintain order and decorum while still allowing Dr. Spiehs to make suggestions about proclamations, or the City's mask policy – whether positively or negatively. The defendants actions of terminating Dr. Spiehs' speech, using police to force him not only from the meeting but from the building over this purported off-topic violation, which also prevented Dr. Spiehs from participating in the following public comment section, is entirely unreasonable and punitive: those actions do not preserve the stated purpose of this public forum. The treatment of Dr. Spiehs is manifestly incompatible with the forum's purposes as demonstrated in its own documented practices. The Court can look no further than the track record of arbitrary inconsistent application of the City Public Comment language by the various presiding mayors. That alone demonstrates there is not an "objective workable standard" that citizens would know as where the boundaries are for public comment speech. The fact is there are no topic boundaries in practice. This practice actually supports the interpretation that "should" is simply a suggestion and not a command as demonstrated in this track record. And one should not forget that the very next meeting after Shipley punished Dr. Spiehs' speech in October, he returned giving exactly the same speech – this time without retribution. The Commission gives themselves free reign to talk about everything on God's green earth and allow other comment speakers to do the same thing – unless his name is Dr. Justin Spiehs. The fact there are no objective workable standards not only manifests from this

documented track record, it comes from the lips of Larsen and Shipley themselves who literally disagree on every definition and avow different actions of enforcement.

Last, the jury has more than enough facts to conclude that Dr. Spiehs was targeted by Shipley and Larsen for his journalistic work as well as his critical viewpoints directed to and published each.  The fact that the very next week after Shipley punished Dr. Spiehs for his speech he repeats the identical topics – without retribution – demonstrates retaliation.   The fact that these defendants have permitted the whole host of literally an unlimited range of topics to be discussed without penalty – repeatedly – over time – is evidence of animus and retaliatory motive directed against Dr. Spiehs.  The Court should grant Dr. Spiehs partial motion for summary judgment. Plaintiff requests oral argument which would benefit the Court.

/s/Linus L. Baker
Linus L. Baker, KS 18197
6732 West 185th Terrace
Stilwell, KS  66085-8922
Telephone:  913.486.3913
Fax:         913.232.8734
E-Mail: linusbaker@prodigy.net
Attorney for the plaintiff

Certificate of Service

The above was provided notice to all parties entitled to such notice pursuant to the Court's electronic filing system.

/s/Linus L. Baker
Attorney for the plaintiff